Filed 9/30/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARIA MARQUEZ et al.,<br><br>　　Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF HEALTH CARE SERVICES et al.,<br><br>　　Defendants and Respondents. | A140488<br><br>(San Francisco County<br>Super. Ct. No. CPF09509847)<br><br>**ORDER MODIFYING OPINION  [NO CHANGE IN THE JUDGMENT]** |

THE COURT:

　　The opinion filed September 2, 2015, is modified as follows:

　　On page 38, delete footnote 17, and renumber all subsequent footnotes.

　　There is no change in the judgment.

　　Appellants' petition for rehearing is denied.

Dated: _____　　_____ P.J.

1

Filed 9/2/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARIA MARQUEZ et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF HEALTH CARE<br>SERVICES et al.,<br><br>        Defendants and Respondents. | A140488<br><br>(San Francisco County<br>Super. Ct. No. CPF09509847) |

Pursuant to federal law, California's Medi-Cal program requires Medi-Cal beneficiaries to utilize services available through any other health coverage (OHC) they may have before accessing Medi-Cal benefits. To this end, respondent State Department of Health Care Services (DHCS) maintains a database with codes that indicate whether a Medi-Cal beneficiary has OHC and, to some extent, the type or scope of that coverage. These codes are available to Medi-Cal providers when a beneficiary seeks services.

Medi-Cal beneficiaries Maria Marquez, Maricella Rivera, and Robert Planthold (petitioners) sought a writ of mandate in the trial court under Code of Civil Procedure section 1085 to require respondents' compliance with their duties in administering this and related aspects of the Medi-Cal program. Because DHCS allegedly permits Medi-Cal providers to refuse nonemergency services to beneficiaries with OHC, and because the codes related to OHC are not always correct and the information maintained in the DHCS database is limited, petitioners argued that beneficiaries may be improperly

2

denied service and referred to other health care providers even when, in reality, there is no OHC available for the requested service. As a result, petitioners urged, beneficiaries experience delays in receiving nonemergency care and, in some circumstances, may be subject to a higher copayment than permitted under Medi-Cal. Petitioners contended, among other things, that the assignment of an OHC code should trigger notice and a hearing. The trial court declined to issue a writ.

In this appeal, petitioners claim entitlement to a writ of mandate requiring respondents to (1) comply with Welfare and Institutions Code section 10950 (section 10950) and California Code of Regulations, title 22, section 50951 (regulation 50951) by providing notice and an opportunity for a hearing whenever DHCS assigns a new or different OHC code to a beneficiary; (2) comply with the due process clauses of the California Constitution by providing such notice and opportunity for a hearing; and (3) comply with duties under state and federal law to provide medically necessary services to Medi-Cal beneficiaries when those services are not actually available from OHC, provide such services promptly and humanely, ensure that beneficiaries are not required to pay copayments above those permitted by federal law, and follow "pay-and-chase" procedures for prenatal or pediatric preventive care and for beneficiaries who have medical support orders.

We conclude that neither section 10950 nor regulation 50951 nor the California Constitution requires DHCS to provide a hearing or notice whenever it assigns a new or different code with respect to OHC. We further conclude that petitioners have not established any violation by respondents of a ministerial duty subject to enforcement by a writ of mandate. We therefore affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

We begin with an overview of California's Medi-Cal program for context, and then discuss the parties' factual and legal contentions in this litigation.

3

A. California's Medi-Cal Program

Medi-Cal is California's program under the joint federal-state program known as Medicaid. (Welf. & Inst. Code, § 14000 et seq.) Medicaid provides federal financial assistance to participating states to support the provision of health care services to certain categories of low-income individuals and families, including the aged, blind, and disabled, as well as pregnant women and others. (42 U.S.C. § 1396 et seq.)

Because California has opted to participate in the Medicaid program and receive federal matching funds, it must comply with all federal Medicaid requirements. (*Conlan v. Bontá* (2002) 102 Cal.App.4th 745, 753 (*Conlan*).) Among other things, the state must administer its Medicaid program through a plan that has been approved by the federal Centers for Medicare and Medicaid Services (CMS). (See 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10, 430.15(b) (2014); Welf. & Inst. Code, § 14100.1.)

By state statute, Medi-Cal is intended to provide, to the extent practicable, medically necessary care to California residents "who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security." (Welf. & Inst. Code, § 14000.) Under Medi-Cal, beneficiaries may receive a broad range of services, including physician and hospital services, optometry, mental health care, and prescription medications. (Welf. & Inst. Code, § 14132; Cal. Code Regs., tit. 22, §§ 51301, 51305, 51308–51317; see 42 U.S.C. § 1396d(a)(xvii).)

The Medi-Cal program does not directly provide services; instead, it reimburses participating health care plans and providers for covered services provided to Medi-Cal beneficiaries. (*Cowan v. Myers* (1986) 187 Cal.App.3d 968, 990 (*Cowan*).) Medi-Cal accomplishes this on a fee-for-service basis or a managed care basis. (See Welf. & Inst. Code, § 14016.5, subd. (b).)

4

About a third of Medi-Cal beneficiaries receive services under the fee-for-service system in which health care practitioners are reimbursed for each covered service they provide. The beneficiary can obtain care from any provider that participates in Medi-Cal, is willing to treat the beneficiary, and is willing to accept reimbursement from DHCS at a set amount for the services provided. (Welf. & Inst. Code, § 14016.5, subd. (b)(1).)

About two-thirds of Medi-Cal beneficiaries receive services through a Medi-Cal managed care plan. Under managed care, DHCS contracts with health maintenance organizations (HMOs) and other managed care plans to provide health coverage to Medi-Cal beneficiaries, and the plans are paid a predetermined amount for each beneficiary per month, whether or not the beneficiary actually receives services. (Welf. & Inst. Code, §§ 14204, 14301, subd. (a); see Cal. Code Regs., tit. 22, § 53800 et seq.) The beneficiary then obtains medical services from a provider within the managed care plan's network. (Welf. & Inst. Code, § 14304.5.)

Medi-Cal is administered by respondent DHCS. (See Welf. & Inst. Code, § 14100.1; 42 U.S.C. § 1396a(a)(5).) Respondent Toby Douglas is DHCS's current director. Respondents acknowledge they "have a legal duty to adopt and implement policies and procedures to ensure that Medi-Cal recipients are able to obtain necessary Medi-Cal benefits and services."

In the 2011–2012 fiscal year, Medi-Cal provided health coverage for approximately 8.3 million beneficiaries at a cost of some $63 billion of combined federal and state funds.

1. Medi-Cal Does Not Pay for Services Covered by Third Parties

Critical to this appeal is the fact that Congress intended Medicaid to be the "payer of last resort." (*Arkansas Dept. of Health and Human Servs. v. Ahlborn* (2006) 547 U.S. 268, 291.) Consistent with this principle, Medi-Cal statutes preclude coverage for health

care services available to the beneficiary through OHC, whether public or commercial. [1] (Welf. & Inst. Code, § 10020, subd. (a) ["No person having private health care coverage shall be entitled to receive the same health care items or services furnished or paid for by a publicly funded health care program"]; § 14000, subd. (b) [Medi-Cal benefits "shall not duplicate those provided under other federal or state laws or under other contractual or legal entitlements of the person or persons receiving them"]; § 14005, subd. (a) [Medi-Cal benefits and services must be provided to eligible residents only "to the extent that such services are neither provided under any other federal or state law nor provided nor available under other contractual or legal entitlements of the person"].) Further, DHCS regulations specify that a beneficiary with OHC is not entitled to receive Medi-Cal benefits or services until available OHC has been exhausted or denied for lack of service coverage. (Cal. Code Regs., tit. 22, § 50761; see *Palumbo v. Myers* (1983) 149 Cal.App.3d 1020, 1027 ["Where the same service is otherwise available to an applicant, it is not covered by Medi-Cal"].)

## 2. Determination of Beneficiaries' OHC

To ensure that the state does not pay for services for which another party may be responsible, Congress required that states determine the potential responsibility of third parties (including health insurers, self-insured plans, group health plans, and managed care organizations) for payment for services provided under the state's program, and to pursue claims against them. (42 U.S.C. § 1396a(a)(25).)

To this end, each state Medicaid agency must ensure that information is collected from applicants and beneficiaries regarding potentially liable third parties when they apply for benefits or are reviewed for continued eligibility, and must establish electronic

---

[1] DHCS identifies other health coverage as "benefits for health related services or entitlements for which a Medi-Cal beneficiary is eligible under any private, group, or indemnification insurance program, under any other State or federal medical care program, or under other contractual or legal entitlement." (See Cal. Code Regs., tit. 22, § 51005, subd. (a).)

6

data exchanges regarding potential third party responsibility with other public agencies and programs.  (42 C.F.R. §§ 433.137, 433.138 (2014).)

California's state Medicaid plan (State Plan) includes provisions implementing these requirements, which have been approved by CMS.  As part of its data exchange system, DHCS has established a system for coding and maintaining OHC information in its Medi-Cal Eligibility Database System (MEDS), which includes information regarding the existence of OHC, the OHC carrier (e.g., Kaiser HMO), and the general scope of coverage by category of services (e.g., vision care, dental, comprehensive).

### 3.  Regulations Designed to Avoid Covering Services Subject to OHC

Medi-Cal applicants and beneficiaries, counties, DHCS, and providers each have responsibilities in assuring that beneficiaries utilize available OHC for a service before accessing Medi-Cal benefits.

### a.  Beneficiaries Report OHC to Counties

Medi-Cal applicants and beneficiaries must apply for and retain available OHC when "no cost is involved."  (Cal. Code Regs., tit. 22, § 50763, subd. (a)(1).)  They must disclose any entitlement to OHC to the county when applying for benefits and upon any benefit redetermination, and must report any changes in coverage.  (Cal. Code Regs., tit. 22, § 50763, subd. (a)(2).)  (DHCS specifically advises them:  "If you are a Medi-Cal beneficiary and have individual or group private health (or dental) insurance coverage, you are required by federal and state law to report it.")  And beneficiaries must *utilize* "available" OHC before utilizing Medi-Cal coverage.  (Cal. Code Regs., tit. 22, § 50763, subd. (a)(3).)  A beneficiary's failure to comply with these requirements may constitute a misdemeanor.  (Welf. & Inst. Code, § 14023.)

According to evidence submitted in connection with petitioners' motion for a writ of mandate, one DHCS representative indicated that approximately 500,000 of 7.1 million Medi-Cal beneficiaries had OHC, while another DHCS representative

estimated that approximately 700,000 of 8.3 million beneficiaries had OHC (other than Medicare).[2]

### b. Counties Code OHC

Counties are responsible for determining Medi-Cal eligibility, enrolling applicants, and conducting eligibility redeterminations. (Welf. & Inst. Code, § 14100; see Cal. Code Regs., tit. 22, § 50101.) As part of these processes, counties are responsible for determining whether an applicant or beneficiary has OHC; coding the name, type, and scope of OHC into the MEDS database, according to DHCS coding guidelines; reporting OHC information to DHCS as requested; and notifying DHCS of any lapse in, or change to, a beneficiary's OHC. (Cal. Code Regs., tit. 22, § 50765; see 42 C.F.R. § 433.138(a) & (b) (2014).) DHCS does not require counties to report the amount or duration of OHC, exclusions from coverage, or the copayment and out-of-pocket costs assessed by the OHC.

### c. DHCS Updates MEDS with Other OHC Information

In addition to receiving OHC information coded into MEDS by the counties, DHCS compares data on beneficiaries in MEDS with millions of records from the major commercial health insurance carriers in California. Specifically, as mandated by federal and state law, DHCS obtains membership and coverage information through monthly electronic exchanges with private insurers and health plans to help identify beneficiaries who have commercial health insurance, as well as the carrier and scope of the coverage and any changes in coverage status. (42 C.F.R. § 433.138(d) (2014); Welf. & Inst. Code, § 14124.90.) Each month, DHCS receives membership records from commercial health carriers regarding approximately 30 million individuals. Based on this information,

---

[2] A footnote in respondents' brief asserts that Medi-Cal enrollment has since increased to approximately 11 million beneficiaries, and the number of beneficiaries with OHC has diminished to roughly 400,000.

DHCS may add OHC information into the system or delete OHC codes for a particular beneficiary.

*d. Provider Is Informed of Beneficiary's OHC Status*

When seeking Medi-Cal services from a provider, beneficiaries disclose their personal Medi-Cal number (by inputting it online or by phone, or by swiping their Benefits Identification Card (BIC) in a point-of-service device). This gives the provider access to the beneficiary's Medi-Cal information in the Automated Eligibility Verification System, including whether DHCS has identified the beneficiary as having OHC and, if so, the plan carrier and contact information and any codes identifying the scope of coverage. The provider may contact the OHC to determine whether the OHC information is accurate, the requested service is covered, and a copayment is required.

*e. Providers' Options in Handling Beneficiaries with OHC*

A provider may not refuse to provide services to a Medi-Cal beneficiary merely because an OHC is potentially responsible for payment for the service. (42 U.S.C. § 1396a(a)(25)(D).) DHCS instructs providers of this obligation.

However, in light of the law barring Medi-Cal's payment for services that a beneficiary is entitled to receive through OHC, DHCS also instructs providers that if the beneficiary's OHC is a managed care plan (i.e., an HMO) or other network of which the provider is not a member, the provider *may* (1) decline to provide nonemergency treatment and refer the beneficiary to the OHC plan for the service; or (2) contact the OHC carrier for authorization to provide the service and to first bill the OHC, rather than DHCS, for the service. If the beneficiary needs emergency services, the provider must provide it or refer the beneficiary to an appropriate emergency facility. (See Health & Saf. Code, § 1317.)

*f. Providers' Reimbursement for Services*

After providing nonemergency services to beneficiaries with OHC, Medi-Cal providers generally must first bill the OHC; if the OHC denies coverage or fails to make payment up to the Medi-Cal rate, the providers may seek reimbursement from Medi-Cal for amounts not paid by the OHC up to the Medi-Cal rate. (Welf. & Inst. Code, § 14124.90; see Cal. Code Regs., tit. 22, § 50769.) Billing the OHC first is referred to as "cost-avoidance" billing.

There are, however, exceptions to cost-avoidance billing, two of which are relevant here. First, federal law effectively requires the state to "pay" providers directly for prenatal and preventative pediatric care (without the provider having to bill any third party responsible for payment), and then "chase" the third party to collect for the Medicaid program. (42 U.S.C. § 1396a(a)(25)(E).) Second, a similar exception applies as to individuals benefiting from a court order requiring a noncustodial parent to provide health coverage. (See 42 U.S.C. § 1396a(a)(25)(F).) In this instance, the provider bills the responsible third party first, but if the third party fails to reimburse the provider within 30 days after the services were furnished, the provider may bill Medi-Cal, and Medi-Cal must pay the provider and chase the third party.

B. This Litigation

Petitioners filed their petition for writ of mandate in September 2009. DHCS filed a demurrer, and petitioners filed a first amended petition before the demurrer was heard. DHCS filed another demurrer, which the court sustained in part, granting leave to amend. Petitioners' second amended petition for writ of mandate, filed in July 2010, is the operative pleading in this appeal.

1. Petitioners' Second Amended Petition

Petitioners assert two causes of action. The first alleges that respondents are failing to comply with their legal duties under state and federal laws to ensure that Medi-

Cal beneficiaries *receive Medi-Cal covered services* when the OHC does not provide such services, or the same amount and scope of such services, or imposes a charge not allowed by the Medi-Cal program. Petitioners' second cause of action alleges that respondents are unlawfully denying Medi-Cal beneficiaries *written notice and an opportunity to be heard* when the beneficiaries are denied Medi-Cal covered benefits on the basis of the availability of OHC.[3]

### 2. Petitioners' Motion for Peremptory Writ of Mandate

Petitioners filed a motion for a peremptory writ of mandate in January 2013. Based in part on evidence obtained during depositions of DHCS officials, petitioners argued that OHC codes are often erroneous or incomplete, DHCS nonetheless instructs Medi-Cal providers to refer beneficiaries to OHC HMOs for treatment, DHCS provides neither notice nor a hearing when OHC is assigned or services are denied due to OHC, and the process for correction or removal of erroneous information is inadequate. Petitioners asserted that Medi-Cal beneficiaries therefore suffer delay and harm because respondents are not complying with their legal duties. The following summarizes petitioners' evidence as relevant to this appeal.

### a. Errors in OHC Coding

Errors in OHC codes arise from various sources. The primary source is the counties' entry of incorrect OHC information into the system.

Another source of error lies in OHC's "data matching" between MEDS and information DHCS obtains from private insurance. This process may mistakenly match a Medi-Cal beneficiary without OHC with another individual who has OHC because of the

---

[3] By the time of the trial court's order in this case, petitioners' request for a writ requiring respondents to provide Medi-Cal beneficiaries with notice and an opportunity to be heard when Medi-Cal *denies coverage* of Medi-Cal covered benefits or services due to the beneficiary's OHC had become a request that respondents be required to provide notice and a hearing when DHCS assigns a *new or different OHC-related code* to a beneficiary. The latter version is before us.

ways "people spell their names and dates of birth, and social security numbers and so on." One DHCS official testified that the "problem with inaccurate social security numbers" was "rampant" in part because insureds often are not required to provide a Social Security number to obtain health insurance and, as a result, "less than half of the health insurance records have social security numbers on them." Nevertheless, upon a data match, the beneficiary's electronic file is coded to indicate OHC, the scope of OHC, and how OHC is delivered (e.g., through an HMO or a prepaid health plan).

Errors in OHC codes also occur in regard to children on Medi-Cal who have OHC as the result of a support order. DHCS receives OHC codes from the Department of Child Support Services for these children, and DHCS is required to input these codes into the Medi-Cal files. A "significant" percentage of this OHC information is unreliable, however, in part because it comes from noncustodial parents who have a legal obligation to provide health insurance as part of child support (or a justification for not doing so; see Cal. Code Regs., tit. 22, § 50185(a)(12)) but may be "less than honest" or "incorrect" in claiming they obtained it.

In addition, there are errors in the OHC information even for beneficiaries who do have OHC. DHCS's "COV" codes are supposed to set forth the scope of coverage available from the OHC. But when "information about a [Medi-Cal] recipient's insurance [coverage] is not available," DHCS assigns an OHC code of "Comprehensive," which signifies "coverage for all medical services except long term care and dental." The actual scope of benefits available from the OHC may be less. Thus, respondents admit that the "OHC coding system does not determine or reflect the amount and scope of medical services which are actually available to the Medi-Cal recipient through the OHC."

Petitioners also point out that OHC codes do not relate certain information that may be important. The coverage codes do not reflect service restrictions, limitations, or utilization caps for included benefits, so they do not indicate definitively whether a

12

requested service would be covered by the OHC. Nor do the codes indicate whether the OHC requires copayments or other cost sharing such as deductibles, or, if so, in what amount. As discussed *post*, federal law limits the copayments and other cost sharing that beneficiaries may be charged. (See, e.g., 42 U.S.C. § 1396o(b).)

### b. *No Notice of OHC Codes or Service Denials*

DHCS does not notify beneficiaries before assigning them an OHC code for the first time or changing their OHC code. Petitioners alleged that many beneficiaries do not discover that their Medi-Cal file includes an OHC code until they seek treatment and their Medi-Cal provider checks their eligibility, sees the code, and declines to treat them.

### c. *Delays Due to OHC Coding Errors*

An erroneous OHC code, combined with DHCS's instructions to providers (i.e., allowing providers to refer a beneficiary to the OHC for service, without requiring them to first confirm the beneficiary has OHC that would cover the service) may result in the beneficiary being denied (at that juncture) services that would otherwise be received through Medi-Cal. The primary problem, it was alleged, is "long delays in the correction of Medi-Cal records to delete the incorrect OHC code for clients with urgent medical needs, or sometimes even no correction after repeated requests."[4]

In 2011, DHCS received approximately 100 to 150 requests per day to address OHC problems, most of them relayed by counties. While DHCS's "goal is to complete

---

[4] Petitioners recount that Marquez's son J.O. was receiving therapy through Medi-Cal until Medi-Cal refused to pay for it due to his Kaiser OHC. Kaiser did not offer weekly individual psychotherapy to J.O, but offered primarily group counseling with other children and family therapy, allegedly 70 to 90 minutes away from his home, with copayments of $20 per visit and up to $150 or more for prescription medications. J.O. thereafter had no individual therapy or mental health medications for several months (and his condition appeared to worsen) until legal advocates obtained restoration of services under Medi-Cal. However, this delay was not due to an *incorrect* OHC code, Marquez did not inform Kaiser of J.O.'s Medi-Cal eligibility, and there is no indication Marquez sought assistance from DHCS in resolving the matter before legal advocates intervened.

an OHC request within 30 days of receipt" and 48 hours for "urgent" requests, processing could "take up to 60 days." Even urgent requests to remove OHC coding errors could take days or weeks. Furthermore, after removal of erroneous codes, the errors might reappear.

### 3. Respondents' Opposition to the Motion for Writ of Mandate

Respondents opposed petitioners' motion, asserting that DHCS procedures adequately dealt with the issues and that, at any rate, petitioners had not established a violation of law or any ministerial duty with which respondents did not comply.

In particular, respondents provided evidence of their measures to remedy coding errors so that the errors would not, in fact, provide a barrier to Medi-Cal services. By February 2011, DHCS had cleared all backlogged requests for removal of OHC codes that DHCS had identified as urgent and "acting as a barrier to care," and such requests were handled "on a daily basis again." As of February 2013, the "Other Coverage Unit" at DHCS handled an average of 150 requests each day to modify or remove OHC information, and these requests were normally handled *within 24 hours*. If OHC could result in the beneficiary not receiving services, "DHCS always honors the request to suppress the other health coverage so that the beneficiary can get timely medical treatment from a Medi-Cal provider for a Medi-Cal service." It is DHCS policy "to *immediately* suppress any [OHC] identifier once DHCS is made aware that it is a potential barrier to receiving needed services." (Italics added.)

Beneficiaries, providers, county eligibility workers, and others may contact the Other Coverage Unit at DHCS to obtain correction of OHC coding information. DHCS's publication "Medi-Cal: What It Means to You"—issued to all Medi-Cal applicants— advises that any erroneous OHC information can be addressed by contacting a county eligibility worker or DHCS. Indeed, *counties* may process an "immediate need

14

transaction" to override OHC information that is incorrect because "the coverage has ended," or for other reasons, where it presents a "barrier to care" for a beneficiary.

In addition, while petitioners noted the unreliability of information received from the Department of Child Support Services regarding OHC for children under medical support orders, by 2011 DHCS began to use more reliable data provided by commercial carriers to identify and correct inaccuracies.

Furthermore, DHCS has taken steps to ensure that OHC information, once identified as incorrect, will not improperly reappear for beneficiaries with the same name as another individual with OHC. This is accomplished by placing those beneficiaries on a "suppression list" and coding their records so they are excluded from OHC matching.[5]

### 4. Trial Court's Denial of Petitioners' Motion

At a hearing on March 29, 2013, the trial court asked the parties to submit further briefing regarding petitioners' standing and the impact of CMS's approval of the State Plan. The court also asked petitioners to submit a revised proposed writ specifying the actions they believed DHCS should be ordered to take to comply with its alleged ministerial duties. Petitioners' revised proposed writ would have required respondents to (1) provide Medi-Cal beneficiaries a written "notice of action" and an opportunity to have an administrative hearing whenever an OHC code is assigned or removed, and whenever a beneficiary's Medi-Cal benefits or services are denied, terminated, suspended, reduced, or delayed as a result of OHC; (2) adopt and implement policies and procedures to (a) require Medi-Cal providers who are outside an OHC's HMO or exclusive provider network not to decline services to a beneficiary due to OHC when services are not actually available from the OHC; (b) ensure that whenever copayments

---

[5]     Respondents also noted that none of the three named petitioners had asserted they, or their children, had been erroneously coded as having OHC. Once DHCS was advised of petitioners' difficulties in receiving a particular service, DHCS promptly remedied the situations.

15

or other cost sharing is imposed by OHC on a beneficiary whose Medi-Cal provider is not in the HMO or network, the beneficiary is relieved of cost sharing in excess of Medi-Cal limits; (c) ensure that Medi-Cal is available to beneficiaries living in an urban ZIP Code when the provider is over 60 miles or 60 minutes away; (d) use the pay-and-chase methodology for prenatal and preventative pediatric care and the 30-day pay-and-chase methodology for children with medical support orders when the provider does not belong to the OHC's HMO or provider network; and (e) ensure prompt access to medical services when OHC is not actually available and the provider is not in the OHC or provider network.

After this briefing and a second hearing on July 31, 2013, the court ruled that petitioners had standing to seek mandamus relief under the "public right/public duty" exception to the beneficial interest requirement. (See *Green v. Obledo* (1981) 29 Cal.3d 126, 144 (*Green*).) However, the court held, petitioners failed to demonstrate that respondents had violated any alleged ministerial duty, and the process by which respondents determined whether there is OHC does not create a denial, termination, or reduction of services mandating notice and a hearing under federal or state law.

Judgment was entered for respondents in October 2013, disposing of all issues between the parties.

This appeal followed.

## II.  DISCUSSION

To obtain a writ of mandate under Code of Civil Procedure section 1085, the petitioner has the burden of proving a clear, present, and usually ministerial duty on the part of the respondent, and a clear, present, and beneficial right in the petitioner for the performance of that duty. (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 21–22.)

16

On appeal from the denial of a motion for such a writ, we resolve questions of law—including questions of statutory interpretation and the adequacy of the alleged ministerial acts at issue in this appeal—by de novo review and the exercise of our independent judgment. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 (*County of San Diego*).)

Applying these principles, we address each of petitioners' contentions in turn.

A. <u>Section 10950 and Regulation 50951 Do Not Require a Hearing</u>

Petitioners contend that respondents have a duty under California statutory and regulatory law to provide Medi-Cal beneficiaries with notice and the opportunity for a hearing whenever DHCS assigns an OHC code, or a new or different OHC code, including codes pertaining to the type or scope of coverage. For brevity, we will refer to these incidents as a "coding event."[6]

1. <u>Law</u>

With certain exceptions inapplicable here, the California Code of Regulations provides the right to a state hearing to a Medi-Cal applicant or beneficiary dissatisfied with any "*action* or inaction" of DHCS "relating to Medi-Cal eligibility or benefits." (Cal. Code Regs., tit. 22, § 50951, subd. (a), italics added.)[7] This right to a hearing is

---

[6] At oral argument in this appeal, petitioners stated that the coding itself is *not* an action that triggers a hearing, but that a hearing is triggered when the code is posted and made available to providers. This theory was not advanced in the trial court or in petitioners' appellate briefs, and the record does not indicate any distinction between the assignment of a code and its availability to providers. Both concepts are included in our phrase "coding event."

[7] This regulation was ostensibly adopted in light of the federal mandate that state plans provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable diligence." (42 U.S.C. § 1396a(a)(3).) Federal Medicaid regulations define an "action" as a "termination, suspension, or reduction of Medicaid eligibility or covered services." (42 C.F.R. § 431.201 (2014).) In this appeal, petitioners base their entitlement to a hearing under state law, not federal law.

17

"governed by the provisions of Sections 10950 through 10965, Welfare and Institutions Code." (Cal. Code Regs., tit. 22, § 50951, subd. (b).)

Section 10950 provides "an opportunity for a state hearing," with some exceptions, to "any applicant for or recipient of public social services [who] is dissatisfied with any *action* of the county department [and, pursuant to regulation 50951, DHCS] relating to his or her application for or receipt of public social services." (Italics added.) "Public social services" include programs, such as Medi-Cal, administered by DHCS. (Welf. & Inst. Code, § 10051.)

The question, therefore, is whether a coding event constitutes a DHCS "action" that triggers the right to a hearing under section 10950 and regulation 50951. In this regard, our fundamental goal is to ascertain the Legislature's intent, and effectuate the statute's purpose, by giving the statutory language a commonsense interpretation in light of the statutory scheme. (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1196; *In re David S.* (2005) 133 Cal.App.4th 1160, 1164.)[8]

Our Supreme Court has observed that, in light of the statutory scheme, the fair hearing mechanism in section 10950 is intended to provide a "speedy" and "informal" " 'means to challenge an administrative action which may reduce or terminate vitally needed social service benefits.' " (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 402 (*Lentz*), quoting *People v. Sims* (1982) 32 Cal.3d 468, 493–494 (Kaus, J., dis.); see *Knight v. McMahon* (1994) 26 Cal.App.4th 747, 755, disapproved on other grounds in *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1023.)

---

[8] A slight clarification is in order. Section 10950, which grants a hearing right with respect to actions by county departments (not DHCS), applies to this proceeding only to the extent it is made applicable by regulation 50951. Therefore, the more precise question may be what DHCS meant by "action or inaction" when enacting regulation 50951 (see 42 C.F.R. § 403.201 (2014)), and *DHCS's* understanding of the scope of section 10950, rather than the legislative intent behind section 10950. The parties equate the two, however, and do not specifically address the intent behind regulation 50951; our conclusion would be the same under either approach.

18

Thus, the right to a hearing under section 10950 typically arises when the county denies an individual's application to enroll in benefits or reduces or terminates the benefits (e.g., *County of Madera v. Holcomb* (1968) 259 Cal.App.2d 226); it may also occur when DHCS directly denies coverage for a specific requested service (*Jeneski v. Myers* (1984) 163 Cal.App.3d 18, 32 (*Jeneski*)).

However, an "action" triggering fair hearing rights under section 10950 and regulation 50951 does not include *every* event during the process of applying for and receiving social services. As the Court of Appeal recognized in *Madrid v. McMahon* (1986) 183 Cal.App.3d 151 (*Madrid* ): "The term 'action' in section 10950 must be given a commonsense construction in keeping with the legislative scheme of which it is a part. [Citation.] The Legislature could not have intended that every event occurring during the processing of an application and the delivery of benefits—no matter how trivial or inconsequential—could be the subject of a demand for an administrative fair hearing." (*Id*. at p. 156.)

In *Madrid*, the court concluded that the test for whether an agency action is subject to challenge in a hearing under section 10950 is "whether it has a significant effect on the claimant's application for or receipt of the aid or other service provided by the county agency." (*Madrid*, *supra*, 183 Cal.App.3d at p. 156.) There, the petitioner had contended that she was entitled to a hearing based on an agency's actions in computing an overpayment of benefits, referring the matter to a fraud investigation department (SIU), the SIU's investigation, referring the case to the district attorney, and filing criminal charges against her. (*Id*. at pp. 155–156.) But none of these events, the court held, constituted an "action" entitling the petitioner to a hearing: the failure of the county to demand return of the overpayment strongly suggested that it had not made a *final* determination of overpayment; the referral of the case to the SIU, the investigation by the SIU, and the referral to the district attorney were all internal actions with *no immediate or direct impact* on plaintiff's application for or receipt of benefits; and the fair hearing

19

process could not be used for the sole purpose of affecting a collateral criminal case. (*Id*. at pp. 156–157.)

Although not directly on point factually, *Madrid* illustrates that state hearings are reserved for agency actions that have an immediate, direct, and significant impact on the ability of a beneficiary to obtain, in this case, medical services. With these precepts in mind, we turn to the record.

### 2. Coding Events Are Not Actions That Trigger a Hearing

OHC coding events are an integral part of ensuring that Medi-Cal is a payor of last resort. The aim of OHC coding is not to deprive a Medi-Cal beneficiary of any service, but to help assure that the cost of that service is borne in the first instance by available OHC. Coding events are therefore qualitatively distinct from a determination that a beneficiary is ineligible for a benefit program overall or a direct denial of a specific request for treatment: if a beneficiary is not coded with OHC, the beneficiary receives the covered service; if the beneficiary *is* coded with OHC, the beneficiary may have to go to another provider, but is *still* entitled to receive the service to the extent of available coverage.

This distinguishing characteristic of OHC coding manifests itself in several ways—discussed next—that ultimately compel the conclusion that OHC coding does not affect a beneficiary's receipt of services so significantly as to require a state hearing.

First, unlike most outright denials of benefit eligibility or specific requests for treatment authorization, OHC coding events have *no immediate impact*. A coding event, in itself, does not affect the beneficiary until he or she has the need to seek a service covered by Medi-Cal from a Medi-Cal provider.

Second, unlike denials of eligibility or treatment authorizations for a specified beneficiary, OHC coding events will eventually affect only *a limited subset* of beneficiaries. Even when a beneficiary seeks a service from a Medi-Cal provider, there is

20

no substantial negative impact of an OHC code if the service is for an *emergency*, since the provider is required to deliver necessary emergency services. And even when the beneficiary seeks nonemergency services, an OHC code has no substantial negative impact if it is *accurate*: the beneficiary would have actual or constructive knowledge of the OHC, as well as the law that OHC must be exhausted before Medi-Cal. (Welf. & Inst. Code, §§ 10020, subd. (a), 14005, subd. (a).) Only if the OHC code turns out to be erroneous or misleading does the coding event potentially impact the delivery of services otherwise covered by Medi-Cal.[9]

Third, even as to this subset of affected beneficiaries, DHCS coding does not *directly* dictate whether a service will be provided by the first Medi-Cal provider the beneficiary sees, let alone whether the service will ever be received. If the beneficiary with an OHC code (even if erroneous) goes to a provider who is within the OHC provider network, the provider will presumably render the service. If the provider is not within the OHC network, DHCS suggests the provider may refer the beneficiary to the OHC, but *DHCS does not mandate that the provider do so*. A provider may elect to (1) confirm whether OHC exists to cover the service and whether there may be any obstacles (including copayment) interfering with the availability of OHC, and treat or refer the patient accordingly; (2) seek authorization from the OHC to treat the patient; (3) refer the

---

[9] Moreover, while it might be that any action wrongly affects a beneficiary only if it turns out to be incorrect, the difference here is twofold. Unlike actions in which an agency evaluates eligibility, denies coverage, or declines treatment authorization, DHCS has little means of discerning whether the coding is incorrect when it assigns the code: OHC codes are less a deliberative evaluation of information by DHCS and more a result of data received from county agencies and private insurers. While DHCS knows that some codes will turn out to be erroneous, it has no plain way of ascertaining which ones at the time of coding. (And, as discussed *post*, DHCS has no ministerial duty to gather more information at this juncture.) In addition, a coding event may become obsolete before it ever comes into play with the beneficiary's attempt to obtain services: the record indicates that beneficiaries typically have seasonal employment and thus their access to OHC is "fluid"; changes in OHC would be captured in the monthly updates from private insurers.

patient to the outside OHC network to receive the service; or (4) treat the patient at risk of not obtaining reimbursement from the beneficiary's OHC. This decision lies with the private provider, not DHCS. (And it is therefore not state action subject to hearing rights under section 10950 or regulation 50951; see *Blum v. Yaretsky* (1982) 457 U.S. 991, 1003–1005 [no state action for due process purposes].)

Fourth, and most importantly, OHC coding ultimately results in a *delay, not a denial or reduction,* of services. OHC coding events do not preclude coverage or treatment altogether. Even if the provider declines the service and refers the beneficiary to his or her purported OHC, there is merely a delay in the time it takes the beneficiary to obtain an appointment with the OHC; if the OHC coding is erroneous or inadequate, there is additional delay—but only delay—while obtaining a correction or bypass of the code. And while we do not trivialize the inconvenience and frustration caused by such delays—or ignore their possible medical consequences—the point is that a coding event, even if erroneous, does not deprive a beneficiary of the service.[10] Accordingly, a coding event is not an "action" requiring a state hearing. (See *Lentz, supra*, 49 Cal.3d at p. 402 [hearing for actions that may "reduce or terminate vitally needed social service benefits"]; *Madrid, supra*, 183 Cal.App.3d at p. 156 [action must have "significant effect on . . . application for or *receipt of the aid or other service*" (italics added)]; see also 42 C.F.R. § 431.201 (2014) ["action" means termination, suspension, or reduction of eligibility or covered services]; 42 U.S.C. § 1396a(a)(3) [hearing for denials of claims for medical assistance].)

---

[10] Petitioners remind us of the regulation stating that a "beneficiary with other health care coverage is not entitled to receive health care benefits and services *under the Medi-Cal schedule of benefits* until the other health care coverage available has been exhausted or denied for lack of service coverage." (Cal. Code Regs., tit. 22, § 50761, italics added.) But this does not mean that a beneficiary with OHC does not receive the services at all. To the extent OHC codes potentially cause a delay in obtaining the service (due to figuring out whether OHC actually covers the service, etc.) or a copayment above what would be permissible under Medi-Cal, we consider the issues *post*.

Finally, as a public policy matter, OHC coding events are *not the type of actions for which a hearing would be necessary or appropriate*.  The purpose of the fair hearing system is to provide a "speedy" and "informal" means of resolving a matter that may reduce or terminate vitally needed benefits.  (*Lentz*, *supra*, 49 Cal.3d at p. 402.)  But in the context of OHC coding, this goal is better met by existing DHCS procedures, which allow beneficiaries to resolve urgent OHC problems through their county eligibility worker or DHCS immediately or within 24 hours if posing a barrier to care (according to DHCS), or perhaps weeks (according to petitioners); resolution of a matter by a state hearing would take much longer.  (See Welf. & Inst. Code, § 10952 [hearing to commence within 30 working days after request filed]; § 10957 [continuance of up to 30 days]; § 10958 [proposed decision filed within 75 days after hearing]; § 10959 [director's decision within 30 days of receipt of proposed decision]; § 10960 [request for rehearing].)  Based on the record in this appeal, requiring notice and hearing rights for OHC coding events would impose a more time-consuming and formal process at no appreciable benefit to beneficiaries.

For all these reasons, an OHC coding event is not an "action" for which Medi-Cal beneficiaries are entitled to a hearing under section 10950 or regulation 50951.

### 3.  Petitioners' Arguments Are Unavailing

Besides the arguments we have implicitly addressed in our discussion so far, petitioners assert three additional arguments in favor of requiring a state hearing for coding events.  We find them unpersuasive.

### a.  Language of Section 10950 and Regulation 50951

Petitioners point out that section 10950 provides a right to a hearing for any recipient "dissatisfied with *any* action . . . *relating to* his or her application for or receipt of public social services," and regulation 50951 states that a beneficiary "shall have the right to a State hearing if dissatisfied with *any* action or inaction of . . . [DHCS] . . .

*relating to* Medi-Cal eligibility or benefits." They urge that the words "any" and "relating" should be viewed expansively and inclusively. (Citing *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798; *People v. Dunbar* (2012) 209 Cal.App.4th 114, 117–118; *Barnick v. Longs Drug Stores, Inc.* (1988) 203 Cal.App.3d 377, 382.)

The question, however, is not the breadth generally communicated by the words "any" or "relating," but the commonsense meaning of the word "action" in light of the particular statutory scheme now before us. That commonsense meaning of "action"—to include only events that have a significant effect on the application for or receipt of aid or service—was articulated nearly three decades ago in *Madrid* and is consistent with the description of the language by our Supreme Court in *Lentz*. Despite the appearance of the words "any" and "relating," petitioners do not provide us with a single instance in which a court required a state hearing under section 10950 or regulation 50951 merely because an agency assigned a beneficiary with a status (e.g., OHC) that might in the future affect a private service provider's decision whether to deliver services or refer the beneficiary to another provider.

### b. *Regulation 50179*

Petitioners also point us to California Code of Regulations, title 22, section 50179 (regulation 50179), which governs when counties must send a beneficiary a "Notice of Action." (Cal. Code Regs., tit. 22, § 50179, subd. (a).) Under this regulation, a beneficiary must be notified of their "Medi-Cal-only eligibility or ineligibility, and of any changes made in their eligibility status or share of cost." (*Ibid.*) "Eligibility" relates to requirements concerning income, assets, and aid categories (aged, blind, disabled, etc.). (See Welf. & Inst. Code, § 14005 et seq.; 42 U.S.C. § 1396a(a)(10)(A); Cal. Code Regs., tit. 22, § 50173.)

The Notice of Action must include information about the "approval, denial or discontinuance of eligibility," the rescission of a denial or discontinuance, or a change in

24

the share of cost.  (Cal. Code Regs., tit. 22, § 50179, subds. (c)(1)–(3).)  The notice also must inform the beneficiary of the right to request a state hearing if he or she is dissatisfied with county action affecting Medi-Cal eligibility or share of cost, and of any DHCS action that "affects" the applicant's or beneficiary's Medi-Cal benefits.  (Cal. Code Regs., tit. 22, § 50179, subd. (c)(4).)  Petitioners argue that this reference to a state hearing regarding an action that merely "affects" benefits shows that the state hearing process does not apply only to the termination of Medi-Cal eligibility or benefits.

If anything, regulation 50179 confirms that OHC coding events should *not* trigger a hearing.  After all, the requirement that the beneficiary be informed of a hearing right as to DHCS action that "affects" Medi-Cal benefits only applies when a Notice of Action is required.  A Notice of Action is required only to inform the beneficiary of "Medi-Cal-only *eligibility or ineligibility*, and of any changes made in their *eligibility* status or share of cost."  (Cal. Code Regs., tit. 22, § 50179, subd. (a), italics added.)  The regulation thus suggests that a hearing is required if there is a change in the beneficiary's Medi-Cal *eligibility* (or changes in cost sharing); but there is no indication whatsoever that a hearing would be required for merely changing a beneficiary's code in a manner that might in the future affect the type of provider through whom the beneficiary may obtain a service.

### *c.* Jeneski

Lastly, petitioners suggest that *Jeneski*, *supra*, 163 Cal.App.3d 18 compels the conclusion that DHCS is obligated to provide a hearing for every OHC coding event.  In *Jeneski*, Medi-Cal recipients sought to enjoin the Department of Health Services and state officials from implementing laws that would delete certain drugs from those for which Medi-Cal would provide reimbursement, and would place other drugs on a list requiring prior authorization; prior authorization could be obtained by a provider submitting a treatment authorization request (TAR) to Medi-Cal.  (*Jeneski*, *supra*, 163 Cal.App.3d at

25

p. 22 & fn. 3; see Welf. & Inst. Code, § 14133.) The trial court initially issued an order restraining defendants from implementing the laws pending a public hearing, but later denied a requested extension and modification and ultimately dissolved the injunction. (*Jeneski*, *supra*, 163 Cal.App.3d at pp. 22–23.) The Court of Appeal reversed, concluding that the prior authorization procedures necessary for obtaining certain drugs were invalid because, among other things, the system did not provide a hearing before the denial of a TAR, and "the person seeking medical assistance should be entitled to a hearing" under section 10950. (*Id.* at p. 32; see *Cowan*, *supra*, 187 Cal.App.3d at p. 986 [agreeing with *Jeneski* that, if the department intends to deny a TAR, it must afford the Medi-Cal recipient the opportunity for a predenial hearing].)

  *Jeneski* is inapposite. The rejection of a TAR is an action by Medi-Cal that directly and categorically precludes Medi-Cal coverage for a particular individual for a particular service or benefit, based on Medi-Cal's assessment of its medical necessity or propriety. If the beneficiary has no other coverage besides Medi-Cal (and cannot pay for the service), the beneficiary will not receive the service. OHC coding, by contrast, merely assigns a status that might, in the future, lead a private provider to delay the beneficiary's receipt of the service. If the beneficiary in fact has available OHC, he or she will receive the service from the OHC; if the beneficiary does not actually have available OHC, the problem can be remedied by an informal process DHCS has already established, so that the beneficiary will still receive the service. *Jeneski* does not compel the conclusion that an OHC coding event triggers a hearing under section 10950.

Petitioners fail to establish that DHCS has a ministerial duty under section 10950 or regulation 50951 to provide a hearing for OHC coding events.[11]

B. The California Constitution Does Not Require a Hearing

Petitioners next contend that respondents have a duty, under the due process clauses of the California Constitution, to provide notice and hearing rights when DHCS changes a Medi-Cal beneficiary's status to OHC. (See Cal. Const., art. I, §§ 7(a), 15.)

"[A]pplication of the [due process] clauses [of the California Constitution] must be determined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures." (*People v. Ramirez* (1979) 25 Cal.3d 260, 263–264 (*Ramirez*).) Thus, when a person is "deprived of a statutorily conferred benefit," there must be an "assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*Id*. at p. 264.) "The required procedural safeguards are those that will, without unduly burdening the government, maximize the accuracy of the resulting decision and respect the dignity of the individual subjected to the decisionmaking process." (*Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 390 (*Oberholzer*).)

1. Statutorily Conferred Benefit or Interest

Respondents argue that petitioners have not satisfied the threshold requirement— that they have been deprived of a "statutorily conferred benefit" or interest. (*Ramirez*, *supra*, 25 Cal.3d at p. 264; *Ryan v. California Interscholastic Federation–San Diego Section* (2001) 94 Cal.App.4th 1048, 1071.) According to respondents, OHC coding and DHCS guidelines allowing providers to refer beneficiaries to their OHC for services do

[11]     To the extent petitioners contend they are entitled to contemporaneous notice of DHCS coding under state statutory or regulatory law, their contention is amiss. Section 10950 and regulation 50951 refer to a hearing, not notice. Regulation 50179(a) requires county departments to notify beneficiaries of their "Medi-Cal-only *eligibility* or ineligibility, and of any changes made in their eligibility status or share of cost." We revisit the notice issue in the context of California due process guarantees, *post*.

27

not themselves deprive the beneficiary of Medi-Cal services; furthermore, a provider's refusal of service or referral to other providers does not constitute state action to which state due process protections may apply. (Citing *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 281–282.) Petitioners counter that Medi-Cal is a statutory benefit, and erroneously coding a recipient as having OHC terminates or suspends enjoyment of that benefit.

We question whether changing a Medi-Cal beneficiary's status to "OHC" and entering or maintaining other OHC-related codes constitutes an "adjudicative procedure[]" (*Ramirez*, *supra*, 25 Cal.3d at pp. 263–264) targeted by our state's due process clause. We also question petitioners' assertion that coding a beneficiary as having OHC in itself terminates or suspends statutory entitlement to Medi-Cal services. Nonetheless, OHC codes do affect the likelihood that some beneficiaries will promptly obtain services otherwise mandated by the Medi-Cal statutes. We will therefore assume the threshold requirement is met and proceed with a due process analysis.

### 2. The *Ramirez* Test

In determining what process is due, consideration must be given to "(1) the *private interest* that will be affected by the official action, (2) the *risk of an erroneous deprivation* of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the *dignitary interest* in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official, and (4) the *governmental interest*, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Ramirez*, *supra*, 25 Cal.3d at p. 269, italics added.)

### a. Beneficiary's Private Interest Affected by Coding

As discussed *ante*, a coding event, in itself, has no immediate effect on the beneficiary until the beneficiary seeks a nonemergency service covered by Medi-Cal from a Medi-Cal provider, the OHC codes turn out to be erroneous or misleading, and the Medi-Cal provider opts not to provide the service and instead refers the beneficiary to another provider, thus risking a delay in the beneficiary's receipt of medical services. Petitioners maintain that such a delay in treatment, however, can exacerbate medical conditions. They insist that some recipients are denied urgently needed treatment for weeks or months as they navigate DHCS or county procedures to obtain removal or correction of OHC codes. They produce evidence that delays in service can result in severe pain, a lack of affordable medication, sleeplessness, the need to pay out of pocket for medications, and deteriorating health. And while DHCS counters that these delays are not significant in light of procedures designed to correct errors within days (or immediately if DHCS is advised that the OHC codes are posing a barrier to care), there is at least a *potential* effect on the beneficiary's interest in receiving prompt medical services under Medi-Cal.

### b. Risk of Violation; Value of Additional Safeguards

We next consider the risk that this private interest will be violated, and the probable value of the additional procedural safeguards that petitioners propose.

Petitioners contend there is a high risk that OHC coding will violate the private interests of beneficiaries because of a "rampant" problem with incorrect Social Security numbers entered into computer records, faulty information from noncustodial parents concerning medical support orders, and partial services covered by insurance companies incorrectly labeled as "comprehensive." Petitioners also note that, at one point in time, DHCS was receiving approximately 100 to 150 requests per day to correct OHC problems.

29

However, petitioners have included nothing in the record to actually quantify this risk. They do not provide evidence indicating the percentage of coding events that are erroneous, the number or percentage of Medi-Cal beneficiaries who are affected, or the number or percentage who experience a delay due to incorrect OHC codes. (Indeed, petitioners themselves do not allege that they suffered any coding error at all.) Even the statistic of 100 to 150 daily requests to fix OHC coding problems would equate to fewer than 40,000 requests a year out of 7 or 8 million beneficiaries, of whom 500,000 to 700,000 have OHC. In short, petitioners fail to show a high risk that the private interests of a Medi-Cal beneficiary will be adversely affected by any particular coding event.

As to the second aspect of this element—the probable value of the proposed additional procedural safeguards—petitioners do not point to any evidence in the record, or even substantially argue, that the additional safeguard or procedure of a *hearing* for every OHC coding event (or even for erroneous codes) would have any significant value above the procedures DHCS already has.

Instead, petitioners turn their attention to DHCS providing contemporaneous *notice* of a coding event, so a beneficiary can take steps to obtain correction of the error before the beneficiary "makes a doctor's appointment, is turned away at the office, and then must wait weeks or months for care."

It is true that immediate notice of OHC coding might enable beneficiaries who know they do not actually have OHC to obtain correction of the error before seeking medical services. The question, however, is whether petitioners have shown that this potential benefit is so significantly advantageous over existing procedures as to compel DHCS—who could not know which codes are incorrect at the time of coding—to notify *all* beneficiaries of each and every coding event, even though a coding error may exist only as to some subset of codes and beneficiaries. After all, there are millions of Medi-Cal beneficiaries in the system, and hundreds of thousands who are coded with OHC.

30

Based on the appellate record, we agree with respondents that the probable value of providing contemporaneous notice of coding events is relatively low. As things stand now, beneficiaries will discover any OHC coding error if they are turned down for service by a provider (as occurred with petitioners Marquez and Rivera). At that point, the beneficiary may assess whether the OHC information is incorrect and request correction or suppression through the county or DHCS. The most recent evidence in the record is that such requests are normally handled within 24 hours.[12]

Petitioners nevertheless complain that merely giving beneficiaries the ability to contact the county or DHCS does not suffice for due process notice, and DHCS is improperly shifting the burden of notice to beneficiaries. (Citing *Vargas v. Trainor* (7th Cir. 1974) 508 F.2d 485, 489–490 (*Vargas*); *Ortiz v. Eichler* (D.Del. 1985) 616 F.Supp. 1046, 1062, on reargument (D.Del. 1985) 616 F.Supp. 1066, affd. (3d Cir. 1986) 794 F.2d 889 (*Ortiz*). In *Vargas* and *Ortiz*, however, it was undisputed that the recipients were *entitled* to a hearing on the agency's decision to reduce or terminate their benefits. The question before those courts, therefore, was not whether a beneficiary was entitled to notice of an occurrence (such as a coding event), but whether the beneficiary was given adequate notice of the agency's decision so it could be challenged meaningfully at the upcoming hearing. (*Vargas*, *supra*, 508 F.2d at pp. 487–490; *Ortiz*, *supra*, 616 F.Supp. at pp. 1051–1053, 1061–1062.) Here, unlike the recipients in *Vargas* and *Ortiz*, the beneficiaries do not have undisputed entitlement to a hearing for a coding event—indeed, their entitlement to a hearing is an issue before us. Petitioners' reliance on *Vargas* and *Ortiz* thus puts the cart before the horse. Moreover, beneficiaries *do* have adequate

---

[12] Petitioners state in their reply brief: "And indeed, those Petitioners and declarants who were able to restore their Medi-Cal were only able to do so after they contacted legal aid offices and other advocacy groups. [Record citations.] Poor people should not have to retain lawyers to see their doctors." The record citations do not support this assertion. Petitioners did not experience erroneous OHC coding. There is no evidence petitioners attempted to contact the county or DHCS to resolve their problems, and when DHCS was finally advised, petitioners' and declarants' matters were promptly resolved.

31

notice, for purposes of challenging an incorrect OHC code, when they are told by providers that they are being referred due to their apparent OHC:  with this information, they can turn to the county or DHCS for relief, and there is nothing more that DHCS could tell them.

### c. *Beneficiary's Dignitary Interest*

We next turn to the dignitary interest beneficiaries have in being informed of the nature, grounds, and consequences of the DHCS action and in being able to present their side of the story before a responsible government official.  The point here is that, even if participation in the decision-making process would not alter the outcome, the fact of participation recognizes the dignity of the individual affected.  (See *Ramirez*, *supra*, 25 Cal.3d at p. 268.)

Beneficiaries who believe there has been an error in OHC coding may be "heard" informally through existing procedures, in which beneficiaries provide information necessary to change or remove their OHC coding to their provider, county workers, or DHCS.  They are informed of the nature, grounds, and consequences of the DHCS action and are able to present their side of the story before a government official.

Petitioners nonetheless argue that respondents' existing procedures do not treat beneficiaries with respect and dignity.  They offer a situation when a mother arrives with her child for a doctor's appointment only to be unexpectedly turned away and told she cannot get treatment for her child unless she makes a payment she cannot afford; or a woman in pain and suspecting infection after having a Caesarean section resorts to pulling out her surgical staples when unable to access medical care.  But petitioners are talking about what might happen as a *result* of an incorrect code, if it is not corrected.  The question here is whether a hearing or notice of a coding event is necessary for the beneficiary to have dignity by way of input and participation in the process for deciding whether the coding is correct.  Petitioners cite no evidence in the record on this point.

Lastly, petitioners' reliance on *Barron v. Superior Court* (2009) 173 Cal.App.4th 293 (*Barron*) is unhelpful. There, a trial court ruling was reversed, in part because it was based on a matter the court raised without warning at the hearing, and thus the proceeding did not adequately comport with due process. (*Id*. at pp. 297–300.) *Barron* says nothing about the adequacy of the DHCS procedures with respect to OHC coding.

### d. Government Interests

The final part of the due process analysis is consideration of the "governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Ramirez*, *supra*, 25 Cal.3d at p. 269.) The government's interests in conserving scarce fiscal and administrative resources and in not imposing further burdens on providers are substantial. Although this governmental interest does not in itself outweigh the recipient's interest in obtaining services, it is a legitimate state concern. (*Frank v. Kizer* (1989) 213 Cal.App.3d 919, 924–925.)

Here, it is undisputed, based on the evidence in the record, that hundreds of thousands of Medi-Cal beneficiaries have OHC at any given time. Moreover, coverage information is updated by DHCS monthly, and evidence in the record suggests that OHC information changes frequently. It may fairly be inferred from the record that formal notice and hearing procedures would necessarily impose fiscal and administrative burdens on the state.[13]

---

[13] Petitioners urge that, since DHCS did not present evidence on the projected cost of providing notice, we should view with skepticism DHCS's claim that the cost of providing notice would be substantial. In the same paragraph, petitioners contend that "DHCS has a multi-billion dollar budget" and it "can afford to provide advance notice to recipients whose Medi-Cal benefits are threatened by possibly erroneous recoding to OHC"—without any citation to evidence in the record.

33

*e. Balancing the Interests*

An OHC coding event has a potential effect on a beneficiary's interest in receiving nonemergency medical services under Medi-Cal without undue delay.  However, petitioners have not shown a high risk that any particular OHC code is erroneous or would cause intolerable delay.  Nor have they demonstrated that a hearing—or notice of a coding event (or referral to an OHC provider)—would have significant value over DHCS's existing procedures, given the record of prompt resolution of coding errors.  Furthermore, the dignitary interest of beneficiaries is facilitated by existing procedures, which allow beneficiaries to participate in the governmental process by which DHCS codes are changed, removed, and maintained.  In light of the size of the task DHCS would face in providing notice and a hearing for every OHC-related coding event as to hundreds of thousands of Medi-Cal beneficiaries who have OHC at any given time, with monthly updates on OHC information, the marginal benefit of petitioners' proposed notice and hearing is outweighed by the substantial cost and burden on DHCS.  (See *Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1183; *Oberholzer*, *supra*, 20 Cal.4th at pp. 390–391.)  California due process does not compel notice and a hearing for OHC coding events.[14]

Accordingly, petitioners fail to establish that respondents have violated a ministerial duty in this regard.

C.  <u>Ministerial Duties Under State and Federal Law</u>

Petitioners lastly contend that, by the manner in which DHCS handles OHC coding and instructs Medi-Cal providers, respondents are violating a number of other

---

[14]    This is not to say that we believe giving a beneficiary notice of his or her OHC status is a bad idea.  To the contrary, it may well be that DHCS or our Legislature can devise an appropriate method of informing beneficiaries of their OHC status, whether by mail, email, secure access to an online profile, or some other procedure.  We hold only that, based on the record in this appeal, petitioners have not established that the notice and hearing they seek are compelled under California law.

34

duties under state and federal law. We conclude they have not shown any violation of a ministerial duty.[15]

### 1. Duty to Provide Medically Necessary Services

According to petitioners, DHCS violates a ministerial duty to provide medically necessary services to Medi-Cal beneficiaries who are coded as having OHC when those services are not actually available from OHC.

#### a. Welfare and Institutions Code Section 14005

Welfare and Institutions Code section 14005, subdivision (a) requires that Medi-Cal's "health care benefits and services" "shall be provided" to eligible state residents to the extent those services and benefits are not "provided nor available under other contractual or legal entitlements of the person."

Petitioners argue that respondents violate section 14005 because, despite knowledge of OHC coding errors, DHCS instructs Medi-Cal providers that they may refuse to treat beneficiaries who have OHC codes when the providers do not belong to

---

[15]    Respondents contend that CMS has approved California's State Plan implementing federal Medicaid requirements, including provisions relating to third party liability, DHCS data match and OHC coding processes, and copayments, and CMS approval is "entitled to deference unless 'palpably erroneous.' " (Citing *RCJ Medical Services, Inc. v. Bontá* (2001) 91 Cal.App.4th 986, 1011; *Managed Pharmacy Care v. Sebelius* (9th Cir. 2013) 716 F.3d 1235, 1247–1248; see *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 810 (*Olszewski*) [" 'Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans' "].) Petitioners disagree, because their claims are based on state law as well as federal law, and, in any event, CMS has not approved the *specific* policies challenged here. (See *Olszewski, supra,* 30 Cal.4th at pp. 825–826.) Furthermore, they claim, *DHCS's* interpretation of state law is not conclusive, and its interpretation of federal law, such as 42 U.S.C. §§ 1396a(a)(8) and (25), is not entitled to deference at all. (*Orthopaedic Hosp. v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1495.) We need not resolve this debate: even without deference to DHCS procedures approved by CMS, we conclude petitioners fail to demonstrate a violation of a ministerial duty.

the OHC network, and consequently beneficiaries whose OHC codes are erroneous—and do not *actually* have available OHC—are deprived of Medi-Cal services and benefits.

Petitioners fail to establish any basis for a writ of mandate. In the first place, as explained *ante*, DHCS's referral authorization does not mean that the beneficiary is denied a covered service; it merely means that the beneficiary will receive the service from a Medi-Cal provider who is a member of the beneficiary's OHC network. Indeed, DHCS's instruction that providers may refer beneficiaries to outside OHC networks is consistent with section 14005 itself—which clearly indicates that Medi-Cal services should not be provided if OHC is available—as well as other statutes to the same effect. (Welf. & Inst. Code, §§ 10020, subd. (a), 14000, subd. (b).)

Furthermore, even if an OHC code is incorrect and OHC is *not* available, DHCS does not preclude any medically necessary service; DHCS will suppress the code or correct it so the services may be rendered under Medi-Cal.

Petitioners' arguments, therefore, do not show that DHCS fails to comply with section 14005, but merely debate *how* DHCS should comply. Petitioners suggest, for example, that DHCS should affirmatively instruct providers *not* to refer Medi-Cal beneficiaries with OHC codes to OHC for treatment unless providers first confirm that the requested services are indeed covered by OHC. There is, however, no law requiring DHCS to do so. Petitioners further complain that MEDS should provide more detailed information regarding the services covered by the beneficiary's OHC, as well as coverage limitations and copayment or geographic information. Again, however, petitioners do not point to any legal requirement that DHCS do this. And, as a practical matter, the information that DHCS already makes available should enable the provider to contact the OHC and obtain current and accurate information relevant to the beneficiary's *specific* requested service, which is a far more efficient procedure than forcing DHCS to gather the information and update it on an ongoing basis with respect to all potential coverage provisions and eventualities.

36

While a writ of mandate may issue to compel compliance with a ministerial duty—an act the law specifically requires—it may not issue to compel an agency to perform that legal duty in a particular manner, or control its exercise of discretion by forcing it to meet its legal obligations in a specific way. (Code Civ. Proc., § 1085; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267; *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.* (2012) 208 Cal.App.4th 1438, 1462–1463.) Petitioners do not establish entitlement to a writ of mandate.

### b. *42 United States Code Section 1396a(a)*

Federal law requires a state plan to make assistance available to all eligible beneficiaries. (42 U.S.C. § 1396a(a)(10)(A)(i).) In addition, the state plan must specify that a Medi-Cal provider "may not refuse to furnish services to an individual (who is entitled to have payment made under the plan for the services the person furnishes) because of a third party's potential liability for payment for the service." (42 U.S.C. § 1396a(a)(25)(D); see 42 C.F.R. § 447.20(b) (2014) ["a third party's potential liability for the service(s)" is not a reason for a provider to refuse to furnish Medicaid services to an eligible beneficiary].)

Petitioners contend DHCS violates these provisions because it tells providers they *can* refuse to furnish services to a beneficiary because of a third party's (OHC's) potential liability for the service. Petitioners are incorrect.

First, DHCS meets the duty imposed by these federal provisions by instructing Medi-Cal providers—in the DHCS manual for providers (Provider Manual)—that they "cannot deny services because . . . [t]he recipient has other health insurance coverage in addition to Medi-Cal," and by reminding providers that they "must not refuse to furnish Medi-Cal covered services to eligible recipients because of a third party's potential liability."

Second, DHCS's advisement that providers may refer beneficiaries to their OHC is not contrary to these provisions. The referral is not because the third party (OHC) is potentially liable for *payment*, but because the OHC must furnish the services so that OHC can be exhausted before Medi-Cal benefits are used. If a third party (even an OHC carrier) were only responsible for *payment* for the service, the provider would be bound by the nonrefusal requirement.

Looking at it another way, the nonrefusal requirement relates only to services for which the beneficiary "is entitled to have payment made" by Medi-Cal. (42 U.S.C. § 1396a(a)(25)(D).) If a beneficiary has available OHC, the beneficiary is not entitled to have payment made by Medi-Cal, and the nonrefusal requirement would not apply. In any event, petitioners fail to show that respondents are violating federal law.[16]

### 2. Duty to Provide Services Promptly and Humanely

Under federal law, the state plan must provide that medical assistance from a Medicaid program "shall be furnished with reasonable promptness to all eligible individuals." (42 U.S.C. § 1396a(a)(8); see 42 C.F.R. § 435.930(a) (2014) [the Medicaid agency "must . . . [f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures"].)

Similarly, under California law, "aid shall be administered and services provided promptly and humanely." (Welf. & Inst. Code, § 10000.) This statute, however, sets forth only a "general statement of policy." (*Board of Supervisors v. Superior Court* (*Comer*) (1989) 207 Cal.App.3d 552, 564 (*Comer*); *Watkins v. County of Alameda* (2009) 177 Cal.App.4th 320, 344 (*Watkins*).) It does not set forth any specific duty or course of

---

[16] In a footnote in their opening brief, petitioners argue that DHCS is violating the comparability requirement of 42 U.S.C. § 1396a(a)(10)(B) by providing covered services to Medi-Cal beneficiaries who do not have available OHC, but not to beneficiaries who are coded to have available OHC but actually do not. Failing to provide substantial argument on this issue, petitioners have abandoned it.

conduct an agency must take, but leaves to the agency's discretion how to pursue the policy goal.

Petitioners argue that respondents violate these provisions by subjecting Medi-Cal beneficiaries to unreasonable delays: because DHCS gives no notice to beneficiaries when they are classified as having OHC, beneficiaries may schedule appointments and seek care from Medi-Cal providers who will decline to treat them; beneficiaries then have to wait for an appointment within the OHC's network, and may learn that they do not have available OHC after all or that the OHC does not provide the service; and efforts to remove or correct erroneous OHC codes can take weeks or longer.

Based on the record in this appeal that OHC errors do not affect the provision of emergency services, that correcting OHC errors may be accomplished within days or weeks for nonemergency services, and that DHCS has taken steps to correct or suppress any erroneous OHC codes, petitioners have not established a failure on the part of DHCS to furnish medical assistance humanely and with reasonable promptness. The system is not perfect, and there may be individuals who, unfortunately, suffer delays and increased pain or complications. We do not minimize those difficulties. But DHCS cannot simply adopt policies and procedures mandating that, for example, fee-for-service providers *do* treat a Medi-Cal beneficiary even if his or her Medi-Cal record indicates the service is available through an outside OHC network, in light of the more specific and controlling statutory obligation to ensure that Medi-Cal is a payor of last resort. (Welf. & Inst. Code, §§ 10020, subd. (a), 14005, subd. (b), 14023, subd. (c); see *Watkins*, *supra*, 177 Cal.App.4th at p. 344 [Legislature's allowance of restrictions on eligibility for General Assistance "necessarily supersedes the more general principles contained in [Welf. & Inst. Code, §] 10000"]; *Comer*, *supra*, 207 Cal.App.3d at p. 564 [statute setting limits on mental health services controlled over more general policy statement in Welf. & Inst. Code, § 10000].) And even if there were other feasible procedures by which services might be delivered *more* promptly or *more* humanely, DHCS's methods accomplish the

minimum requirements of the statutes' objectives, and the possibility of alternative procedures is not at issue for purposes of mandamus.

Petitioners' reliance on *Cooke v. Superior Court* (1989) 213 Cal.App.3d 401, disapproved on other grounds in *County of San Diego*, *supra*, 15 Cal.4th at p. 106, is misplaced. There, a county medical services program violated "section 10000's command that relief be administered humanely" when it only offered emergency dental care, and its refusal to offer nonemergency care forced indigent residents to "live with untreated infection and chronic pain." (*Id*. at pp. 404–405, 413–415.) Here, DHCS procedures do provide for nonemergency care.

### 3. Duty Not to Allow Copayment Above Medicaid Limit

Federal law limits the amount and type of cost sharing—including copayments—a state can require Medicaid beneficiaries to contribute to covered health care. Some beneficiaries can generally be charged a "nominal" amount, while certain beneficiaries under the age of 18 and pregnant women cannot be charged any copayment. (42 U.S.C. §§ 1396o(a) & (b), 1396o-1(b)(3)(B); 42 C.F.R. §§ 447.51–447.57 (2014).)

In the context of OHC, federal guidance has further specified that "if the applicant/recipient is required to pay a deductible or copayment for utilization of a service under a [private prepaid health] plan, that plan service *is not an available third party resource* unless the State agency or any other third party (i.e., other than the recipient) pays the deductible or copayment on behalf of the individual, or the deductible or copayment is waived by the plan." (HCFA Program Issuance Transmittal Notice, Region IV, MCD-32-86, Third Party Liability—Medicaid Eligible Enrollment in a Non-Medicaid Prepaid Capitation Arangement, Aug. 6, 1986, italics added.) Thus a plan would not constitute available OHC if the beneficiary must pay the copayment; and if OHC is not available, DHCS cannot deny payment of services under Medi-Cal.

40

Petitioners complain that DHCS has no policy deeming OHC unavailable when the OHC assesses copayments or other charges in excess of the amounts permitted by Medi-Cal. Moreover, while DHCS has a policy of *paying* copayments on behalf of beneficiaries with OHC if the beneficiary's Medi-Cal provider is a member of the OHC's network (and can therefore bill the OHC for delivering care), DHCS does not cover the payment if the provider does not belong to the OHC network, so the beneficiary's OHC will still be considered available even when copayments required by the OHC exceed Medicaid limits. Petitioners seek a writ of mandate prohibiting DHCS from instructing Medi-Cal providers to decline treatment and refer beneficiaries to their OHC when the OHC charges copayments for covered services above those allowed by federal and state law. Otherwise, they claim, beneficiaries with little or no income are forced to choose between paying a copayment above what is allowed by Medicaid or forgoing needed medical care. (Citing *Nebraska Pharmacists v. Dept. of Social Services* (D.Neb. 1994) 863 F.Supp. 1037, 1046 ["the difference between a one dollar or two dollar copayment . . . is significant (and not nominal) to those who are poor and in need of prescription services"].)

Petitioners are incorrect. DHCS instructs Medi-Cal providers that they may *not* charge beneficiaries with copayments above what is established by Medi-Cal. The Provider Manual identifies these amounts, consistent with law, as one dollar for outpatient services and drug prescriptions and refills, and five dollars for nonemergency services provided in an emergency room. Providers are also advised that "the collection of the copayment by the provider [from the beneficiary] is optional" (although the beneficiary remains liable to the provider for it), and "[a] provider of service cannot, under law, deny care or services to an individual solely because of the person's inability to copay." (See Welf. & Inst. Code, § 14134, subd. (a)(8).)

As a result, if a beneficiary has OHC and the Medi-Cal provider is not within the OHC network, and is referred to a provider who is within the network and enrolled with

41

Medi-Cal (and the beneficiary presents his or her BIC, or discloses he or she has Medi-Cal), the beneficiary will *not* be charged more than the nominal copayment amount authorized under Medi-Cal.[17]  In short, the beneficiary need only go to a Medi-Cal provider within the OHC network and the beneficiary will not have a copayment over Medi-Cal limits.

There is, therefore, no need for petitioners' proposed requirement that DHCS have a policy requiring that OHC be deemed unavailable if the OHC carrier may assess a copayment in excess of the amount permitted under Medi-Cal.  Moreover, DHCS is in compliance with the law.

### 4.  Duty to "Pay and Chase"

As discussed *ante*, in most instances a Medi-Cal provider must seek payment first from a beneficiary's OHC.  For prenatal or preventive care services, however, the state must pay providers (without the provider first billing the OHC) and then "chase" the OHC for reimbursement.  (42 U.S.C. § 1396a(a)(25)(E).)  Similarly, for services provided to minors who have OHC pursuant to a child support enforcement order, the state must pay providers if the OHC has not made payment within 30 days after the service, and then chase the OHC.  Petitioners contend respondents violate their ministerial duties by failing to apply these requirements.

### a.  Standing

These "pay-and-chase" provisions address only the process by which providers are reimbursed for certain types of services rendered.  They are certainly of interest to *providers*, but respondents argue they do not give rise to any "public right" or "public duty" sufficient to support "citizen" standing under the judicially created exception to the beneficial interest requirement.  (*Green*, *supra*, 29 Cal.3d at p. 144.)  Nor, respondents

---

[17]  Petitioner Marquez did not present J.O.'s BIC to Kaiser or otherwise advise Kaiser that he had Medi-Cal coverage.

claim, can petitioners show a beneficial interest requisite for mandamus. (See Code Civ. Proc., § 1086; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165, 170.) Indeed, courts have held that certain provisions of 42 United States Code section 1396a(a)(25) grant neither beneficiaries nor providers rights enforceable under federal law. *(Martes v. Chief Exec. Officer of South Broward* (11th Cir. 2012) 683 F.3d 1323, 1330 ["balance billing" provisions]; *Wesley Health Care Center, Inc. v. DeBuono* (2d Cir. 2001) 244 F.3d 280, 283–285 [cost-avoidance procedures].)

Petitioners, on the other hand, insist that pay-and-chase requirements protect beneficiaries by ensuring services to those needing prenatal care and preventive pediatric care or having OHC through a child support enforcement order. The provision of public aid to the needy is of statewide concern and generally a proper subject for mandamus. (See, e.g., *Bd. of Soc. Welfare v. County of L.A.* (1945) 27 Cal.2d 98, 100; *Green*, *supra*, 29 Cal.3d at pp. 144–145; *Conlan*, *supra*, 102 Cal.App.4th at pp. 763–764; *Brown v. Crandall* (2011) 198 Cal.App.4th 1, 13–14.) We will assume petitioners have standing.

### b. Prenatal or Preventive Pediatric Care

As mentioned, federal law requires the state plan to provide that, "in the case of prenatal or preventive pediatric care" covered by the plan, the state shall make payment "without regard to the liability of a third party for payment for such services" and then "seek reimbursement from such third party." (42 U.S.C. § 1396a(a)(25)(E); see 42 C.F.R. § 433.139(b)(3)(i) (2014) ["The agency must pay the full amount allowed under the agency's payment schedule for the claim and seek reimbursement from any liable third party" if the "claim is prenatal care for pregnant women, or preventive pediatric services"].) A provider may thus bill the state directly for these services without having to seek recovery first from the beneficiary's OHC (or other potentially liable third party).

DHCS's Provider Manual states that Medi-Cal may *not* be billed directly for pregnancy care and preventive pediatric services if the beneficiary has OHC through an HMO, and that the "HMO benefits must be used first." But this is consistent with the obligation that OHC benefits be used before Medi-Cal. Moreover, the record also indicates that DHCS has "established business rules with its fiscal intermediary, Xerox Corporation, directing it to suppress any [OHC] and *allow* payment of Medi-Cal fee-for-service provider claims for any prenatal and pediatric preventive service procedure claims services." (Italics added.)

Nonetheless, petitioners argue, the DHCS rules with Xerox do not expressly apply where a Medi-Cal provider is *not* a fee-for-service provider and delivers the prenatal or preventive pediatric care on a managed care basis to a Medi-Cal beneficiary who has OHC through an HMO. Furthermore, petitioners contend, there is no indication that DHCS *tells* providers to submit reimbursement claims to Xerox rather than the OHC. As a result, petitioners speculate that providers will bill the OHC HMO, rather than DHCS or Xerox.

The critical point, however, is that petitioners do not direct us to any record evidence that respondents are actually failing to comply with the law. Petitioners do not cite any instance in which DHCS failed to make payment for prenatal care or preventive pediatric care in violation of a statutory mandate. In the absence of a violation of a legal duty, petitioners fail to demonstrate any basis for mandamus.[18]

---

[18]    Respondents add that, for services to be subject to pay-and-chase rules, the services must be "*covered* under the State [Medi-Cal] plan." (42 U.S.C. § 1396a(a)(25)(E), italics added.) Services that a beneficiary is entitled to receive through his or her OHC must be exhausted before accessing Medi-Cal benefits and, in respondents' view, are not covered by the plan. (Welf. & Inst. Code, §§ 10020, subd. (a), 14000, subd. (b).) DHCS therefore asserts that it properly allows providers to refer beneficiaries to their OHC network with a managed care plan where OHC information indicates the services are available through that plan.

### c. Minors with OHC Pursuant to Court Order

A state plan must provide that the state shall pay a provider, and later seek reimbursement from a beneficiary's OHC, for services provided to a beneficiary "on whose behalf child support enforcement is being carried out by the State," if "payment has not been made by such third party within 30 days after such services are furnished." (42 U.S.C. § 1396a(a)(25)(F).) Petitioners contend that respondents have already admitted their failure to comply with this requirement.

### (1) DHCS's Discovery Response

In a request for admission, petitioners asked respondents to admit: "For children who have both Medi-Cal coverage and OHC and whose non-custodial parents have been ordered by a court to provide 'medical support' (i.e. health insurance), Respondent DHCS' policies and procedures do not *ensure* that the Medi-Cal program pays health care providers for providing service(s) to these children when the OHC has not [been] paid for these service(s) within 30 days of provision of the service(s)." (Italics added.) After objecting to the request as vague and ambiguous, especially as to the phrase "do not ensure," respondents admitted the request "because if DHCS did otherwise, it would be not complying with federal guidelines."

Petitioners contend this is an admission of noncompliance with 42 United States Code section 1396a(a)(25)(F), and that respondents are bound by the admission. (Code Civ. Proc. § 2033.410, subd. (a); *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 775.) Respondents counter that they objected to the request for admission, did not intend to admit noncompliance with the law, and the State Plan and DHCS's Medi-Cal Eligibility Manual conclusively demonstrate that DHCS not only complies but goes beyond the requirements of the section, allowing providers to bill Medi-Cal for services provided to children who have court-ordered OHC without first billing the OHC carrier and waiting for a failure by the carrier to respond.

DHCS's discovery response was not an unqualified admission, and there is some ambiguity as to what it meant in agreeing that its policies and procedures do not "ensure" that Medi-Cal pays providers when the OHC has failed to pay within 30 days. In any event, the trial court did not err, in the context of this mandamus action, in considering the State Plan and the Medi-Cal Eligibility Manual to determine what, in fact, respondents' relevant procedures are. (See *Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 277–278.)

### (2) Merits

The State Plan provides that the "pay and chase method" will be used "for the purpose of recovering Third Party Liability when services covered under the plan are furnished to an individual on whose behalf child support enforcement is being carried out by" the relevant state agency. In addition, the Medi-Cal Eligibility Manual indicates that "pay and chase" applies to services to a Medi-Cal beneficiary with OHC resulting from a child support or medical support order. Specifically, it states, "Under Federal Law (42 [United States Code section] 1396a[(a)](25)) health insurance belonging to a Medi-Cal beneficiary in a child or medical support enforcement case is used by the following method, also referred to as 'pay and chase.' "

These policy statements reflect respondents' compliance with the law. Indeed, DHCS policy seems to *exceed* the requirements of 42 United States Code section 1396a(a)(25)(F) and require pay-and-chase billing for covered services provided to children under medical support orders *without regard* to whether the OHC has first failed to pay within 30 days.

Petitioners nevertheless argue that respondents have cited no provision in the Provider Manual, or identified any instruction to DHCS's fiscal intermediary, that shows the state has a procedure for *ensuring* such payment to providers. But petitioners cite no

law expressly requiring such a procedure.  Nor do they cite any evidence that the absence of this instruction has caused a violation of the pay-and-chase rule.

Petitioners also note that the Eligibility Manual, in addition to stating that pay-and-chase rules apply, further states, "When the other health insurance is a Prepaid Health Plan (PHP) or a Health Maintenance Organization (HMO), however, the dependent [child] *must* utilize the plan's facilities for regular medical care."  (Italics substituted for underscoring.)  Thus, petitioners infer, the DHCS policy is that "pay and chase" does *not* apply to children with medical support orders if their OHC is with managed care.

Petitioners are incorrect.  The cited language merely reiterates the fact that a beneficiary, including one under a child support order, who has OHC for the services at issue, is required to utilize the OHC for those services.  Accordingly, petitioners do not establish that DHCS is in violation of any ministerial duty with respect to pay and chase.

In the final analysis, petitioners fail to demonstrate entitlement to their requested writ of mandate.[19]

### III.  DISPOSITION

The judgment is affirmed.

---

[19]     Respondents filed a request on October 9, 2014, seeking judicial notice of a letter from DHCS to counties that updated DHCS instructions regarding the reporting and correction of OHC information, along with an updated version of DHCS OHC reporting and correction procedures from the DHCS Web site, which advises beneficiaries that they may update OHC information and provides a means of doing so.  Petitioners opposed the request on the grounds that the material was not presented to the trial court and the truth of the matters asserted in official acts of state agencies is not subject to judicial notice.  We deferred ruling until our decision on the merits.  We now grant the request, but only for purposes of general background.  We do not rely on the material in reaching our conclusions in this appeal; we rely only on the evidence before the trial court.

_____

NEEDHAM, J.

We concur.

_____
SIMONS, Acting P.J.

_____
BRUINIERS, J.

(A140488)

San Francisco County Superior Court Case No. CPF09509847, Richard A. Kramer, Judge.

Western Center on Law and Poverty, Robert D. Newman and Richard A. Rothschild; Bay Area Legal Aid, Michael Keys; Youth Law Center, Alice Bussiere and Maria Ramiu; Multiforum Advocacy Solutions, Lucy Quacinella for Plaintiffs and Appellants.

Neighborhood Legal Services of Los Angeles County, Catherine S. Murphy for Plaintiff and Appellant Maricella Rivera.

Abigail K. Coursolle, Kimberly Lewis and Shyaam Subramanian for National Health Law Program as Amicus Curiae on behalf of Appellants.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Susan M. Carson, Joshua N. Sondheimer and Cheryl L. Feiner, Deputy Attorneys General, for Defendants and Respondents.

(A140488)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARIA MARQUEZ et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>DEPARTMENT OF HEALTH CARE<br>SERVICES et al.,<br><br>　　　Defendants and Respondents. | A140488<br><br>(San Francisco County<br>Super. Ct. No. CPF09509847) |

Pursuant to federal law, California's Medi-Cal program requires Medi-Cal beneficiaries to utilize services available through any other health coverage (OHC) they may have before accessing Medi-Cal benefits. To this end, respondent State Department of Health Care Services (DHCS) maintains a database with codes that indicate whether a Medi-Cal beneficiary has OHC and, to some extent, the type or scope of that coverage. These codes are available to Medi-Cal providers when a beneficiary seeks services.

Medi-Cal beneficiaries Maria Marquez, Maricella Rivera, and Robert Planthold (petitioners) sought a writ of mandate in the trial court under Code of Civil Procedure section 1085 to require respondents' compliance with their duties in administering this and related aspects of the Medi-Cal program. Because DHCS allegedly permits Medi-Cal providers to refuse nonemergency services to beneficiaries with OHC, and because the codes related to OHC are not always correct and the information maintained in the DHCS database is limited, petitioners argued that beneficiaries may be improperly denied service and referred to other health care providers even when, in reality, there is no OHC available for the requested service. As a result, petitioners urged, beneficiaries

51

experience delays in receiving nonemergency care and, in some circumstances, may be subject to a higher copayment than permitted under Medi-Cal. Petitioners contended, among other things, that the assignment of an OHC code should trigger notice and a hearing. The trial court declined to issue a writ.

In this appeal, petitioners claim entitlement to a writ of mandate requiring respondents to (1) comply with Welfare and Institutions Code section 10950 (section 10950) and California Code of Regulations, title 22, section 50951 (regulation 50951) by providing notice and an opportunity for a hearing whenever DHCS assigns a new or different OHC code to a beneficiary; (2) comply with the due process clauses of the California Constitution by providing such notice and opportunity for a hearing; and (3) comply with duties under state and federal law to provide medically necessary services to Medi-Cal beneficiaries when those services are not actually available from OHC, provide such services promptly and humanely, ensure that beneficiaries are not required to pay copayments above those permitted by federal law, and follow "pay-and-chase" procedures for prenatal or pediatric preventive care and for beneficiaries who have medical support orders.

We conclude that neither section 10950 nor regulation 50951 nor the California Constitution requires DHCS to provide a hearing or notice whenever it assigns a new or different code with respect to OHC. We further conclude that petitioners have not established any violation by respondents of a ministerial duty subject to enforcement by a writ of mandate. We therefore affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

We begin with an overview of California's Medi-Cal program for context, and then discuss the parties' factual and legal contentions in this litigation.

### A. California's Medi-Cal Program

Medi-Cal is California's program under the joint federal-state program known as Medicaid. (Welf. & Inst. Code, § 14000 et seq.) Medicaid provides federal financial assistance to participating states to support the provision of health care services to certain

categories of low-income individuals and families, including the aged, blind, and disabled, as well as pregnant women and others. (42 U.S.C. § 1396 et seq.)

Because California has opted to participate in the Medicaid program and receive federal matching funds, it must comply with all federal Medicaid requirements. (*Conlan v. Bontá* (2002) 102 Cal.App.4th 745, 753 (*Conlan*).) Among other things, the state must administer its Medicaid program through a plan that has been approved by the federal Centers for Medicare and Medicaid Services (CMS). (See 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10, 430.15(b) (2014); Welf. & Inst. Code, § 14100.1.)

By state statute, Medi-Cal is intended to provide, to the extent practicable, medically necessary care to California residents "who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security." (Welf. & Inst. Code, § 14000.) Under Medi-Cal, beneficiaries may receive a broad range of services, including physician and hospital services, optometry, mental health care, and prescription medications. (Welf. & Inst. Code, § 14132; Cal. Code Regs., tit. 22, §§ 51301, 51305, 51308–51317; see 42 U.S.C. § 1396d(a)(xvii).)

The Medi-Cal program does not directly provide services; instead, it reimburses participating health care plans and providers for covered services provided to Medi-Cal beneficiaries. (*Cowan v. Myers* (1986) 187 Cal.App.3d 968, 990 (*Cowan*).) Medi-Cal accomplishes this on a fee-for-service basis or a managed care basis. (See Welf. & Inst. Code, § 14016.5, subd. (b).)

About a third of Medi-Cal beneficiaries receive services under the fee-for-service system in which health care practitioners are reimbursed for each covered service they provide. The beneficiary can obtain care from any provider that participates in Medi-Cal, is willing to treat the beneficiary, and is willing to accept reimbursement from DHCS at a set amount for the services provided. (Welf. & Inst. Code, § 14016.5, subd. (b)(1).)

About two-thirds of Medi-Cal beneficiaries receive services through a Medi-Cal managed care plan. Under managed care, DHCS contracts with health maintenance

53

organizations (HMOs) and other managed care plans to provide health coverage to Medi-Cal beneficiaries, and the plans are paid a predetermined amount for each beneficiary per month, whether or not the beneficiary actually receives services. (Welf. & Inst. Code, §§ 14204, 14301, subd. (a); see Cal. Code Regs., tit. 22, § 53800 et seq.) The beneficiary then obtains medical services from a provider within the managed care plan's network. (Welf. & Inst. Code, § 14304.5.)

Medi-Cal is administered by respondent DHCS. (See Welf. & Inst. Code, § 14100.1; 42 U.S.C. § 1396a(a)(5).) Respondent Toby Douglas is DHCS's current director. Respondents acknowledge they "have a legal duty to adopt and implement policies and procedures to ensure that Medi-Cal recipients are able to obtain necessary Medi-Cal benefits and services."

In the 2011–2012 fiscal year, Medi-Cal provided health coverage for approximately 8.3 million beneficiaries at a cost of some $63 billion of combined federal and state funds.

1. Medi-Cal Does Not Pay for Services Covered by Third Parties

Critical to this appeal is the fact that Congress intended Medicaid to be the "payer of last resort." (*Arkansas Dept. of Health and Human Servs. v. Ahlborn* (2006) 547 U.S. 268, 291.) Consistent with this principle, Medi-Cal statutes preclude coverage for health care services available to the beneficiary through OHC, whether public or commercial. [20] (Welf. & Inst. Code, § 10020, subd. (a) ["No person having private health care coverage shall be entitled to receive the same health care items or services furnished or paid for by a publicly funded health care program"]; § 14000, subd. (b) [Medi-Cal benefits "shall not duplicate those provided under other federal or state laws or under other contractual or legal entitlements of the person or persons receiving them"]; § 14005, subd. (a)

---

[20] DHCS identifies other health coverage as "benefits for health related services or entitlements for which a Medi-Cal beneficiary is eligible under any private, group, or indemnification insurance program, under any other State or federal medical care program, or under other contractual or legal entitlement." (See Cal. Code Regs., tit. 22, § 51005, subd. (a).)

54

[Medi-Cal benefits and services must be provided to eligible residents only "to the extent that such services are neither provided under any other federal or state law nor provided nor available under other contractual or legal entitlements of the person"].) Further, DHCS regulations specify that a beneficiary with OHC is not entitled to receive Medi-Cal benefits or services until available OHC has been exhausted or denied for lack of service coverage. (Cal. Code Regs., tit. 22, § 50761; see *Palumbo v. Myers* (1983) 149 Cal.App.3d 1020, 1027 ["Where the same service is otherwise available to an applicant, it is not covered by Medi-Cal"].)

### 2. Determination of Beneficiaries' OHC

To ensure that the state does not pay for services for which another party may be responsible, Congress required that states determine the potential responsibility of third parties (including health insurers, self-insured plans, group health plans, and managed care organizations) for payment for services provided under the state's program, and to pursue claims against them. (42 U.S.C. § 1396a(a)(25).)

To this end, each state Medicaid agency must ensure that information is collected from applicants and beneficiaries regarding potentially liable third parties when they apply for benefits or are reviewed for continued eligibility, and must establish electronic data exchanges regarding potential third party responsibility with other public agencies and programs. (42 C.F.R. §§ 433.137, 433.138 (2014).)

California's state Medicaid plan (State Plan) includes provisions implementing these requirements, which have been approved by CMS. As part of its data exchange system, DHCS has established a system for coding and maintaining OHC information in its Medi-Cal Eligibility Database System (MEDS), which includes information regarding the existence of OHC, the OHC carrier (e.g., Kaiser HMO), and the general scope of coverage by category of services (e.g., vision care, dental, comprehensive).

3. <u>Regulations Designed to Avoid Covering Services Subject to OHC</u>

Medi-Cal applicants and beneficiaries, counties, DHCS, and providers each have responsibilities in assuring that beneficiaries utilize available OHC for a service before accessing Medi-Cal benefits.

*a. Beneficiaries Report OHC to Counties*

Medi-Cal applicants and beneficiaries must apply for and retain available OHC when "no cost is involved." (Cal. Code Regs., tit. 22, § 50763, subd. (a)(1).) They must disclose any entitlement to OHC to the county when applying for benefits and upon any benefit redetermination, and must report any changes in coverage. (Cal. Code Regs., tit. 22, § 50763, subd. (a)(2).) (DHCS specifically advises them: "If you are a Medi-Cal beneficiary and have individual or group private health (or dental) insurance coverage, you are required by federal and state law to report it.") And beneficiaries must *utilize* "available" OHC before utilizing Medi-Cal coverage. (Cal. Code Regs., tit. 22, § 50763, subd. (a)(3).) A beneficiary's failure to comply with these requirements may constitute a misdemeanor. (Welf. & Inst. Code, § 14023.)

According to evidence submitted in connection with petitioners' motion for a writ of mandate, one DHCS representative indicated that approximately 500,000 of 7.1 million Medi-Cal beneficiaries had OHC, while another DHCS representative estimated that approximately 700,000 of 8.3 million beneficiaries had OHC (other than Medicare).[21]

*b. Counties Code OHC*

Counties are responsible for determining Medi-Cal eligibility, enrolling applicants, and conducting eligibility redeterminations. (Welf. & Inst. Code, § 14100; see Cal. Code Regs., tit. 22, § 50101.) As part of these processes, counties are responsible for determining whether an applicant or beneficiary has OHC; coding the name, type, and scope of OHC into the MEDS database, according to DHCS coding guidelines; reporting

---

[21] A footnote in respondents' brief asserts that Medi-Cal enrollment has since increased to approximately 11 million beneficiaries, and the number of beneficiaries with OHC has diminished to roughly 400,000.

OHC information to DHCS as requested; and notifying DHCS of any lapse in, or change to, a beneficiary's OHC. (Cal. Code Regs., tit. 22, § 50765; see 42 C.F.R. § 433.138(a) & (b) (2014).) DHCS does not require counties to report the amount or duration of OHC, exclusions from coverage, or the copayment and out-of-pocket costs assessed by the OHC.

### c. DHCS Updates MEDS with Other OHC Information

In addition to receiving OHC information coded into MEDS by the counties, DHCS compares data on beneficiaries in MEDS with millions of records from the major commercial health insurance carriers in California. Specifically, as mandated by federal and state law, DHCS obtains membership and coverage information through monthly electronic exchanges with private insurers and health plans to help identify beneficiaries who have commercial health insurance, as well as the carrier and scope of the coverage and any changes in coverage status. (42 C.F.R. § 433.138(d) (2014); Welf. & Inst. Code, § 14124.90.) Each month, DHCS receives membership records from commercial health carriers regarding approximately 30 million individuals. Based on this information, DHCS may add OHC information into the system or delete OHC codes for a particular beneficiary.

### d. Provider Is Informed of Beneficiary's OHC Status

When seeking Medi-Cal services from a provider, beneficiaries disclose their personal Medi-Cal number (by inputting it online or by phone, or by swiping their Benefits Identification Card (BIC) in a point-of-service device). This gives the provider access to the beneficiary's Medi-Cal information in the Automated Eligibility Verification System, including whether DHCS has identified the beneficiary as having OHC and, if so, the plan carrier and contact information and any codes identifying the scope of coverage. The provider may contact the OHC to determine whether the OHC information is accurate, the requested service is covered, and a copayment is required.

*e. Providers' Options in Handling Beneficiaries with OHC*

A provider may not refuse to provide services to a Medi-Cal beneficiary merely because an OHC is potentially responsible for payment for the service. (42 U.S.C. § 1396a(a)(25)(D).) DHCS instructs providers of this obligation.

However, in light of the law barring Medi-Cal's payment for services that a beneficiary is entitled to receive through OHC, DHCS also instructs providers that if the beneficiary's OHC is a managed care plan (i.e., an HMO) or other network of which the provider is not a member, the provider *may* (1) decline to provide nonemergency treatment and refer the beneficiary to the OHC plan for the service; or (2) contact the OHC carrier for authorization to provide the service and to first bill the OHC, rather than DHCS, for the service. If the beneficiary needs emergency services, the provider must provide it or refer the beneficiary to an appropriate emergency facility. (See Health & Saf. Code, § 1317.)

*f. Providers' Reimbursement for Services*

After providing nonemergency services to beneficiaries with OHC, Medi-Cal providers generally must first bill the OHC; if the OHC denies coverage or fails to make payment up to the Medi-Cal rate, the providers may seek reimbursement from Medi-Cal for amounts not paid by the OHC up to the Medi-Cal rate. (Welf. & Inst. Code, § 14124.90; see Cal. Code Regs., tit. 22, § 50769.) Billing the OHC first is referred to as "cost-avoidance" billing.

There are, however, exceptions to cost-avoidance billing, two of which are relevant here. First, federal law effectively requires the state to "pay" providers directly for prenatal and preventative pediatric care (without the provider having to bill any third party responsible for payment), and then "chase" the third party to collect for the Medicaid program. (42 U.S.C. § 1396a(a)(25)(E).) Second, a similar exception applies as to individuals benefiting from a court order requiring a noncustodial parent to provide health coverage. (See 42 U.S.C. § 1396a(a)(25)(F).) In this instance, the provider bills the responsible third party first, but if the third party fails to reimburse the provider

within 30 days after the services were furnished, the provider may bill Medi-Cal, and Medi-Cal must pay the provider and chase the third party.

## B. This Litigation

Petitioners filed their petition for writ of mandate in September 2009. DHCS filed a demurrer, and petitioners filed a first amended petition before the demurrer was heard. DHCS filed another demurrer, which the court sustained in part, granting leave to amend. Petitioners' second amended petition for writ of mandate, filed in July 2010, is the operative pleading in this appeal.

### 1. Petitioners' Second Amended Petition

Petitioners assert two causes of action. The first alleges that respondents are failing to comply with their legal duties under state and federal laws to ensure that Medi-Cal beneficiaries *receive Medi-Cal covered services* when the OHC does not provide such services, or the same amount and scope of such services, or imposes a charge not allowed by the Medi-Cal program. Petitioners' second cause of action alleges that respondents are unlawfully denying Medi-Cal beneficiaries *written notice and an opportunity to be heard* when the beneficiaries are denied Medi-Cal covered benefits on the basis of the availability of OHC.[22]

### 2. Petitioners' Motion for Peremptory Writ of Mandate

Petitioners filed a motion for a peremptory writ of mandate in January 2013. Based in part on evidence obtained during depositions of DHCS officials, petitioners argued that OHC codes are often erroneous or incomplete, DHCS nonetheless instructs Medi-Cal providers to refer beneficiaries to OHC HMOs for treatment, DHCS provides neither notice nor a hearing when OHC is assigned or services are denied due to OHC,

---

[22] By the time of the trial court's order in this case, petitioners' request for a writ requiring respondents to provide Medi-Cal beneficiaries with notice and an opportunity to be heard when Medi-Cal *denies coverage* of Medi-Cal covered benefits or services due to the beneficiary's OHC had become a request that respondents be required to provide notice and a hearing when DHCS assigns a *new or different OHC-related code* to a beneficiary. The latter version is before us.

59

and the process for correction or removal of erroneous information is inadequate. Petitioners asserted that Medi-Cal beneficiaries therefore suffer delay and harm because respondents are not complying with their legal duties. The following summarizes petitioners' evidence as relevant to this appeal.

### a. Errors in OHC Coding

Errors in OHC codes arise from various sources. The primary source is the counties' entry of incorrect OHC information into the system.

Another source of error lies in OHC's "data matching" between MEDS and information DHCS obtains from private insurance. This process may mistakenly match a Medi-Cal beneficiary without OHC with another individual who has OHC because of the ways "people spell their names and dates of birth, and social security numbers and so on." One DHCS official testified that the "problem with inaccurate social security numbers" was "rampant" in part because insureds often are not required to provide a Social Security number to obtain health insurance and, as a result, "less than half of the health insurance records have social security numbers on them." Nevertheless, upon a data match, the beneficiary's electronic file is coded to indicate OHC, the scope of OHC, and how OHC is delivered (e.g., through an HMO or a prepaid health plan).

Errors in OHC codes also occur in regard to children on Medi-Cal who have OHC as the result of a support order. DHCS receives OHC codes from the Department of Child Support Services for these children, and DHCS is required to input these codes into the Medi-Cal files. A "significant" percentage of this OHC information is unreliable, however, in part because it comes from noncustodial parents who have a legal obligation to provide health insurance as part of child support (or a justification for not doing so; see Cal. Code Regs., tit. 22, § 50185(a)(12)) but may be "less than honest" or "incorrect" in claiming they obtained it.

In addition, there are errors in the OHC information even for beneficiaries who do have OHC. DHCS's "COV" codes are supposed to set forth the scope of coverage available from the OHC. But when "information about a [Medi-Cal] recipient's

insurance [coverage] is not available," DHCS assigns an OHC code of "Comprehensive," which signifies "coverage for all medical services except long term care and dental." The actual scope of benefits available from the OHC may be less. Thus, respondents admit that the "OHC coding system does not determine or reflect the amount and scope of medical services which are actually available to the Medi-Cal recipient through the OHC."

Petitioners also point out that OHC codes do not relate certain information that may be important. The coverage codes do not reflect service restrictions, limitations, or utilization caps for included benefits, so they do not indicate definitively whether a requested service would be covered by the OHC. Nor do the codes indicate whether the OHC requires copayments or other cost sharing such as deductibles, or, if so, in what amount. As discussed *post*, federal law limits the copayments and other cost sharing that beneficiaries may be charged. (See, e.g., 42 U.S.C. § 1396o(b).)

### b. *No Notice of OHC Codes or Service Denials*

DHCS does not notify beneficiaries before assigning them an OHC code for the first time or changing their OHC code. Petitioners alleged that many beneficiaries do not discover that their Medi-Cal file includes an OHC code until they seek treatment and their Medi-Cal provider checks their eligibility, sees the code, and declines to treat them.

### c. *Delays Due to OHC Coding Errors*

An erroneous OHC code, combined with DHCS's instructions to providers (i.e., allowing providers to refer a beneficiary to the OHC for service, without requiring them to first confirm the beneficiary has OHC that would cover the service) may result in the beneficiary being denied (at that juncture) services that would otherwise be received through Medi-Cal. The primary problem, it was alleged, is "long delays in the correction

61

of Medi-Cal records to delete the incorrect OHC code for clients with urgent medical needs, or sometimes even no correction after repeated requests."[23]

In 2011, DHCS received approximately 100 to 150 requests per day to address OHC problems, most of them relayed by counties. While DHCS's "goal is to complete an OHC request within 30 days of receipt" and 48 hours for "urgent" requests, processing could "take up to 60 days." Even urgent requests to remove OHC coding errors could take days or weeks. Furthermore, after removal of erroneous codes, the errors might reappear.

### 3. Respondents' Opposition to the Motion for Writ of Mandate

Respondents opposed petitioners' motion, asserting that DHCS procedures adequately dealt with the issues and that, at any rate, petitioners had not established a violation of law or any ministerial duty with which respondents did not comply.

In particular, respondents provided evidence of their measures to remedy coding errors so that the errors would not, in fact, provide a barrier to Medi-Cal services. By February 2011, DHCS had cleared all backlogged requests for removal of OHC codes that DHCS had identified as urgent and "acting as a barrier to care," and such requests were handled "on a daily basis again." As of February 2013, the "Other Coverage Unit" at DHCS handled an average of 150 requests each day to modify or remove OHC information, and these requests were normally handled *within 24 hours*. If OHC could result in the beneficiary not receiving services, "DHCS always honors the request to

---

[23]    Petitioners recount that Marquez's son J.O. was receiving therapy through Medi-Cal until Medi-Cal refused to pay for it due to his Kaiser OHC. Kaiser did not offer weekly individual psychotherapy to J.O, but offered primarily group counseling with other children and family therapy, allegedly 70 to 90 minutes away from his home, with copayments of $20 per visit and up to $150 or more for prescription medications. J.O. thereafter had no individual therapy or mental health medications for several months (and his condition appeared to worsen) until legal advocates obtained restoration of services under Medi-Cal. However, this delay was not due to an *incorrect* OHC code, Marquez did not inform Kaiser of J.O.'s Medi-Cal eligibility, and there is no indication Marquez sought assistance from DHCS in resolving the matter before legal advocates intervened.

suppress the other health coverage so that the beneficiary can get timely medical treatment from a Medi-Cal provider for a Medi-Cal service." It is DHCS policy "to *immediately* suppress any [OHC] identifier once DHCS is made aware that it is a potential barrier to receiving needed services." (Italics added.)

Beneficiaries, providers, county eligibility workers, and others may contact the Other Coverage Unit at DHCS to obtain correction of OHC coding information. DHCS's publication "Medi-Cal: What It Means to You"—issued to all Medi-Cal applicants— advises that any erroneous OHC information can be addressed by contacting a county eligibility worker or DHCS. Indeed, *counties* may process an "immediate need transaction" to override OHC information that is incorrect because "the coverage has ended," or for other reasons, where it presents a "barrier to care" for a beneficiary.

In addition, while petitioners noted the unreliability of information received from the Department of Child Support Services regarding OHC for children under medical support orders, by 2011 DHCS began to use more reliable data provided by commercial carriers to identify and correct inaccuracies.

Furthermore, DHCS has taken steps to ensure that OHC information, once identified as incorrect, will not improperly reappear for beneficiaries with the same name as another individual with OHC. This is accomplished by placing those beneficiaries on a "suppression list" and coding their records so they are excluded from OHC matching.[24]

### 4. Trial Court's Denial of Petitioners' Motion

At a hearing on March 29, 2013, the trial court asked the parties to submit further briefing regarding petitioners' standing and the impact of CMS's approval of the State Plan. The court also asked petitioners to submit a revised proposed writ specifying the actions they believed DHCS should be ordered to take to comply with its alleged ministerial duties. Petitioners' revised proposed writ would have required respondents to

---

[24] Respondents also noted that none of the three named petitioners had asserted they, or their children, had been erroneously coded as having OHC. Once DHCS was advised of petitioners' difficulties in receiving a particular service, DHCS promptly remedied the situations.

(1) provide Medi-Cal beneficiaries a written "notice of action" and an opportunity to have an administrative hearing whenever an OHC code is assigned or removed, and whenever a beneficiary's Medi-Cal benefits or services are denied, terminated, suspended, reduced, or delayed as a result of OHC; (2) adopt and implement policies and procedures to (a) require Medi-Cal providers who are outside an OHC's HMO or exclusive provider network not to decline services to a beneficiary due to OHC when services are not actually available from the OHC; (b) ensure that whenever copayments or other cost sharing is imposed by OHC on a beneficiary whose Medi-Cal provider is not in the HMO or network, the beneficiary is relieved of cost sharing in excess of Medi-Cal limits; (c) ensure that Medi-Cal is available to beneficiaries living in an urban ZIP Code when the provider is over 60 miles or 60 minutes away; (d) use the pay-and-chase methodology for prenatal and preventative pediatric care and the 30-day pay-and-chase methodology for children with medical support orders when the provider does not belong to the OHC's HMO or provider network; and (e) ensure prompt access to medical services when OHC is not actually available and the provider is not in the OHC or provider network.

After this briefing and a second hearing on July 31, 2013, the court ruled that petitioners had standing to seek mandamus relief under the "public right/public duty" exception to the beneficial interest requirement. (See *Green v. Obledo* (1981) 29 Cal.3d 126, 144 (*Green*).) However, the court held, petitioners failed to demonstrate that respondents had violated any alleged ministerial duty, and the process by which respondents determined whether there is OHC does not create a denial, termination, or reduction of services mandating notice and a hearing under federal or state law.

Judgment was entered for respondents in October 2013, disposing of all issues between the parties.

This appeal followed.

II.  DISCUSSION

To obtain a writ of mandate under Code of Civil Procedure section 1085, the petitioner has the burden of proving a clear, present, and usually ministerial duty on the part of the respondent, and a clear, present, and beneficial right in the petitioner for the performance of that duty.  (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 21–22.)

On appeal from the denial of a motion for such a writ, we resolve questions of law—including questions of statutory interpretation and the adequacy of the alleged ministerial acts at issue in this appeal—by de novo review and the exercise of our independent judgment.  (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109 (*County of San Diego*).)

Applying these principles, we address each of petitioners' contentions in turn.

A.  Section 10950 and Regulation 50951 Do Not Require a Hearing

Petitioners contend that respondents have a duty under California statutory and regulatory law to provide Medi-Cal beneficiaries with notice and the opportunity for a hearing whenever DHCS assigns an OHC code, or a new or different OHC code, including codes pertaining to the type or scope of coverage.  For brevity, we will refer to these incidents as a "coding event."[25]

1.  Law

With certain exceptions inapplicable here, the California Code of Regulations provides the right to a state hearing to a Medi-Cal applicant or beneficiary dissatisfied with any "*action* or inaction" of DHCS "relating to Medi-Cal eligibility or benefits."

---

[25]     At oral argument in this appeal, petitioners stated that the coding itself is *not* an action that triggers a hearing, but that a hearing is triggered when the code is posted and made available to providers.  This theory was not advanced in the trial court or in petitioners' appellate briefs, and the record does not indicate any distinction between the assignment of a code and its availability to providers.  Both concepts are included in our phrase "coding event."

(Cal. Code Regs., tit. 22, § 50951, subd. (a), italics added.)[26]  This right to a hearing is "governed by the provisions of Sections 10950 through 10965, Welfare and Institutions Code."  (Cal. Code Regs., tit. 22, § 50951, subd. (b).)

Section 10950 provides "an opportunity for a state hearing," with some exceptions, to "any applicant for or recipient of public social services [who] is dissatisfied with any *action* of the county department [and, pursuant to regulation 50951, DHCS] relating to his or her application for or receipt of public social services."  (Italics added.)  "Public social services" include programs, such as Medi-Cal, administered by DHCS.  (Welf. & Inst. Code, § 10051.)

The question, therefore, is whether a coding event constitutes a DHCS "action" that triggers the right to a hearing under section 10950 and regulation 50951.  In this regard, our fundamental goal is to ascertain the Legislature's intent, and effectuate the statute's purpose, by giving the statutory language a commonsense interpretation in light of the statutory scheme.  (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1196; *In re David S.* (2005) 133 Cal.App.4th 1160, 1164.)[27]

Our Supreme Court has observed that, in light of the statutory scheme, the fair hearing mechanism in section 10950 is intended to provide a "speedy" and "informal" " 'means to challenge an administrative action which may reduce or terminate vitally

---

[26]    This regulation was ostensibly adopted in light of the federal mandate that state plans provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable diligence."  (42 U.S.C. § 1396a(a)(3).)  Federal Medicaid regulations define an "action" as a "termination, suspension, or reduction of Medicaid eligibility or covered services."  (42 C.F.R. § 431.201 (2014).)  In this appeal, petitioners base their entitlement to a hearing under state law, not federal law.

[27]    A slight clarification is in order.  Section 10950, which grants a hearing right with respect to actions by county departments (not DHCS), applies to this proceeding only to the extent it is made applicable by regulation 50951.  Therefore, the more precise question may be what DHCS meant by "action or inaction" when enacting regulation 50951 (see 42 C.F.R. § 403.201 (2014)), and *DHCS's* understanding of the scope of section 10950, rather than the legislative intent behind section 10950.  The parties equate the two, however, and do not specifically address the intent behind regulation 50951; our conclusion would be the same under either approach.

needed social service benefits.' " (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 402 (*Lentz*), quoting *People v. Sims* (1982) 32 Cal.3d 468, 493–494 (Kaus, J., dis.); see *Knight v. McMahon* (1994) 26 Cal.App.4th 747, 755, disapproved on other grounds in *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1023.) Thus, the right to a hearing under section 10950 typically arises when the county denies an individual's application to enroll in benefits or reduces or terminates the benefits (e.g., *County of Madera v. Holcomb* (1968) 259 Cal.App.2d 226); it may also occur when DHCS directly denies coverage for a specific requested service (*Jeneski v. Myers* (1984) 163 Cal.App.3d 18, 32 (*Jeneski*)).

However, an "action" triggering fair hearing rights under section 10950 and regulation 50951 does not include *every* event during the process of applying for and receiving social services. As the Court of Appeal recognized in *Madrid v. McMahon* (1986) 183 Cal.App.3d 151 (*Madrid* ): "The term 'action' in section 10950 must be given a commonsense construction in keeping with the legislative scheme of which it is a part. [Citation.] The Legislature could not have intended that every event occurring during the processing of an application and the delivery of benefits—no matter how trivial or inconsequential—could be the subject of a demand for an administrative fair hearing." (*Id*. at p. 156.)

In *Madrid*, the court concluded that the test for whether an agency action is subject to challenge in a hearing under section 10950 is "whether it has a significant effect on the claimant's application for or receipt of the aid or other service provided by the county agency." (*Madrid*, *supra*, 183 Cal.App.3d at p. 156.) There, the petitioner had contended that she was entitled to a hearing based on an agency's actions in computing an overpayment of benefits, referring the matter to a fraud investigation department (SIU), the SIU's investigation, referring the case to the district attorney, and filing criminal charges against her. (*Id*. at pp. 155–156.) But none of these events, the court held, constituted an "action" entitling the petitioner to a hearing: the failure of the county to demand return of the overpayment strongly suggested that it had not made a *final* determination of overpayment; the referral of the case to the SIU, the investigation by the

67

SIU, and the referral to the district attorney were all internal actions with *no immediate or direct impact* on plaintiff's application for or receipt of benefits; and the fair hearing process could not be used for the sole purpose of affecting a collateral criminal case. (*Id.* at pp. 156–157.)

Although not directly on point factually, *Madrid* illustrates that state hearings are reserved for agency actions that have an immediate, direct, and significant impact on the ability of a beneficiary to obtain, in this case, medical services. With these precepts in mind, we turn to the record.

### 2. Coding Events Are Not Actions That Trigger a Hearing

OHC coding events are an integral part of ensuring that Medi-Cal is a payor of last resort. The aim of OHC coding is not to deprive a Medi-Cal beneficiary of any service, but to help assure that the cost of that service is borne in the first instance by available OHC. Coding events are therefore qualitatively distinct from a determination that a beneficiary is ineligible for a benefit program overall or a direct denial of a specific request for treatment: if a beneficiary is not coded with OHC, the beneficiary receives the covered service; if the beneficiary *is* coded with OHC, the beneficiary may have to go to another provider, but is *still* entitled to receive the service to the extent of available coverage.

This distinguishing characteristic of OHC coding manifests itself in several ways—discussed next—that ultimately compel the conclusion that OHC coding does not affect a beneficiary's receipt of services so significantly as to require a state hearing.

First, unlike most outright denials of benefit eligibility or specific requests for treatment authorization, OHC coding events have *no immediate impact*. A coding event, in itself, does not affect the beneficiary until he or she has the need to seek a service covered by Medi-Cal from a Medi-Cal provider.

Second, unlike denials of eligibility or treatment authorizations for a specified beneficiary, OHC coding events will eventually affect only *a limited subset* of beneficiaries. Even when a beneficiary seeks a service from a Medi-Cal provider, there is

no substantial negative impact of an OHC code if the service is for an *emergency*, since the provider is required to deliver necessary emergency services. And even when the beneficiary seeks nonemergency services, an OHC code has no substantial negative impact if it is *accurate*: the beneficiary would have actual or constructive knowledge of the OHC, as well as the law that OHC must be exhausted before Medi-Cal. (Welf. & Inst. Code, §§ 10020, subd. (a), 14005, subd. (a).) Only if the OHC code turns out to be erroneous or misleading does the coding event potentially impact the delivery of services otherwise covered by Medi-Cal.[28]

Third, even as to this subset of affected beneficiaries, DHCS coding does not *directly* dictate whether a service will be provided by the first Medi-Cal provider the beneficiary sees, let alone whether the service will ever be received. If the beneficiary with an OHC code (even if erroneous) goes to a provider who is within the OHC provider network, the provider will presumably render the service. If the provider is not within the OHC network, DHCS suggests the provider may refer the beneficiary to the OHC, but *DHCS does not mandate that the provider do so*. A provider may elect to (1) confirm whether OHC exists to cover the service and whether there may be any obstacles (including copayment) interfering with the availability of OHC, and treat or refer the patient accordingly; (2) seek authorization from the OHC to treat the patient; (3) refer the patient to the outside OHC network to receive the service; or (4) treat the patient at risk

---

[28]  Moreover, while it might be that any action wrongly affects a beneficiary only if it turns out to be incorrect, the difference here is twofold. Unlike actions in which an agency evaluates eligibility, denies coverage, or declines treatment authorization, DHCS has little means of discerning whether the coding is incorrect when it assigns the code: OHC codes are less a deliberative evaluation of information by DHCS and more a result of data received from county agencies and private insurers. While DHCS knows that some codes will turn out to be erroneous, it has no plain way of ascertaining which ones at the time of coding. (And, as discussed *post*, DHCS has no ministerial duty to gather more information at this juncture.) In addition, a coding event may become obsolete before it ever comes into play with the beneficiary's attempt to obtain services: the record indicates that beneficiaries typically have seasonal employment and thus their access to OHC is "fluid"; changes in OHC would be captured in the monthly updates from private insurers.

of not obtaining reimbursement from the beneficiary's OHC. This decision lies with the private provider, not DHCS. (And it is therefore not state action subject to hearing rights under section 10950 or regulation 50951; see *Blum v. Yaretsky* (1982) 457 U.S. 991, 1003–1005 [no state action for due process purposes].)

Fourth, and most importantly, OHC coding ultimately results in a *delay, not a denial or reduction,* of services. OHC coding events do not preclude coverage or treatment altogether. Even if the provider declines the service and refers the beneficiary to his or her purported OHC, there is merely a delay in the time it takes the beneficiary to obtain an appointment with the OHC; if the OHC coding is erroneous or inadequate, there is additional delay—but only delay—while obtaining a correction or bypass of the code. And while we do not trivialize the inconvenience and frustration caused by such delays—or ignore their possible medical consequences—the point is that a coding event, even if erroneous, does not deprive a beneficiary of the service.[29] Accordingly, a coding event is not an "action" requiring a state hearing. (See *Lentz*, *supra*, 49 Cal.3d at p. 402 [hearing for actions that may "reduce or terminate vitally needed social service benefits"]; *Madrid*, *supra*, 183 Cal.App.3d at p. 156 [action must have "significant effect on . . . application for or *receipt of the aid or other service*" (italics added)]; see also 42 C.F.R. § 431.201 (2014) ["action" means termination, suspension, or reduction of eligibility or covered services]; 42 U.S.C. § 1396a(a)(3) [hearing for denials of claims for medical assistance].)

Finally, as a public policy matter, OHC coding events are *not the type of actions for which a hearing would be necessary or appropriate*. The purpose of the fair hearing system is to provide a "speedy" and "informal" means of resolving a matter that may

---

[29] Petitioners remind us of the regulation stating that a "beneficiary with other health care coverage is not entitled to receive health care benefits and services *under the Medi-Cal schedule of benefits* until the other health care coverage available has been exhausted or denied for lack of service coverage." (Cal. Code Regs., tit. 22, § 50761, italics added.) But this does not mean that a beneficiary with OHC does not receive the services at all. To the extent OHC codes potentially cause a delay in obtaining the service (due to figuring out whether OHC actually covers the service, etc.) or a copayment above what would be permissible under Medi-Cal, we consider the issues *post*.

70

reduce or terminate vitally needed benefits. (*Lentz*, *supra*, 49 Cal.3d at p. 402.) But in the context of OHC coding, this goal is better met by existing DHCS procedures, which allow beneficiaries to resolve urgent OHC problems through their county eligibility worker or DHCS immediately or within 24 hours if posing a barrier to care (according to DHCS), or perhaps weeks (according to petitioners); resolution of a matter by a state hearing would take much longer. (See Welf. & Inst. Code, § 10952 [hearing to commence within 30 working days after request filed]; § 10957 [continuance of up to 30 days]; § 10958 [proposed decision filed within 75 days after hearing]; § 10959 [director's decision within 30 days of receipt of proposed decision]; § 10960 [request for rehearing].) Based on the record in this appeal, requiring notice and hearing rights for OHC coding events would impose a more time-consuming and formal process at no appreciable benefit to beneficiaries.

For all these reasons, an OHC coding event is not an "action" for which Medi-Cal beneficiaries are entitled to a hearing under section 10950 or regulation 50951.

### 3. Petitioners' Arguments Are Unavailing

Besides the arguments we have implicitly addressed in our discussion so far, petitioners assert three additional arguments in favor of requiring a state hearing for coding events. We find them unpersuasive.

#### a. Language of Section 10950 and Regulation 50951

Petitioners point out that section 10950 provides a right to a hearing for any recipient "dissatisfied with *any* action . . . *relating to* his or her application for or receipt of public social services," and regulation 50951 states that a beneficiary "shall have the right to a State hearing if dissatisfied with *any* action or inaction of . . . [DHCS] . . . *relating to* Medi-Cal eligibility or benefits." They urge that the words "any" and "relating" should be viewed expansively and inclusively. (Citing *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798; *People v. Dunbar* (2012) 209 Cal.App.4th 114, 117–118; *Barnick v. Longs Drug Stores, Inc.* (1988) 203 Cal.App.3d 377, 382.)

The question, however, is not the breadth generally communicated by the words "any" or "relating," but the commonsense meaning of the word "action" in light of the particular statutory scheme now before us. That commonsense meaning of "action"—to include only events that have a significant effect on the application for or receipt of aid or service—was articulated nearly three decades ago in *Madrid* and is consistent with the description of the language by our Supreme Court in *Lentz*. Despite the appearance of the words "any" and "relating," petitioners do not provide us with a single instance in which a court required a state hearing under section 10950 or regulation 50951 merely because an agency assigned a beneficiary with a status (e.g., OHC) that might in the future affect a private service provider's decision whether to deliver services or refer the beneficiary to another provider.

### b. Regulation 50179

Petitioners also point us to California Code of Regulations, title 22, section 50179 (regulation 50179), which governs when counties must send a beneficiary a "Notice of Action." (Cal. Code Regs., tit. 22, § 50179, subd. (a).) Under this regulation, a beneficiary must be notified of their "Medi-Cal-only eligibility or ineligibility, and of any changes made in their eligibility status or share of cost." (*Ibid*.) "Eligibility" relates to requirements concerning income, assets, and aid categories (aged, blind, disabled, etc.). (See Welf. & Inst. Code, § 14005 et seq.; 42 U.S.C. § 1396a(a)(10)(A); Cal. Code Regs., tit. 22, § 50173.)

The Notice of Action must include information about the "approval, denial or discontinuance of eligibility," the rescission of a denial or discontinuance, or a change in the share of cost. (Cal. Code Regs., tit. 22, § 50179, subds. (c)(1)–(3).) The notice also must inform the beneficiary of the right to request a state hearing if he or she is dissatisfied with county action affecting Medi-Cal eligibility or share of cost, and of any DHCS action that "affects" the applicant's or beneficiary's Medi-Cal benefits. (Cal. Code Regs., tit. 22, § 50179, subd. (c)(4).) Petitioners argue that this reference to a state

hearing regarding an action that merely "affects" benefits shows that the state hearing process does not apply only to the termination of Medi-Cal eligibility or benefits.

If anything, regulation 50179 confirms that OHC coding events should *not* trigger a hearing. After all, the requirement that the beneficiary be informed of a hearing right as to DHCS action that "affects" Medi-Cal benefits only applies when a Notice of Action is required. A Notice of Action is required only to inform the beneficiary of "Medi-Cal-only *eligibility or ineligibility*, and of any changes made in their *eligibility* status or share of cost." (Cal. Code Regs., tit. 22, § 50179, subd. (a), italics added.) The regulation thus suggests that a hearing is required if there is a change in the beneficiary's Medi-Cal *eligibility* (or changes in cost sharing); but there is no indication whatsoever that a hearing would be required for merely changing a beneficiary's code in a manner that might in the future affect the type of provider through whom the beneficiary may obtain a service.

### *c.* Jeneski

Lastly, petitioners suggest that *Jeneski*, *supra*, 163 Cal.App.3d 18 compels the conclusion that DHCS is obligated to provide a hearing for every OHC coding event. In *Jeneski*, Medi-Cal recipients sought to enjoin the Department of Health Services and state officials from implementing laws that would delete certain drugs from those for which Medi-Cal would provide reimbursement, and would place other drugs on a list requiring prior authorization; prior authorization could be obtained by a provider submitting a treatment authorization request (TAR) to Medi-Cal. (*Jeneski*, *supra*, 163 Cal.App.3d at p. 22 & fn. 3; see Welf. & Inst. Code, § 14133.) The trial court initially issued an order restraining defendants from implementing the laws pending a public hearing, but later denied a requested extension and modification and ultimately dissolved the injunction. (*Jeneski*, *supra*, 163 Cal.App.3d at pp. 22–23.) The Court of Appeal reversed, concluding that the prior authorization procedures necessary for obtaining certain drugs were invalid because, among other things, the system did not provide a hearing before the denial of a TAR, and "the person seeking medical assistance should be entitled to a

hearing" under section 10950.  (*Id.* at p. 32; see *Cowan*, *supra*, 187 Cal.App.3d at p. 986 [agreeing with *Jeneski* that, if the department intends to deny a TAR, it must afford the Medi-Cal recipient the opportunity for a predenial hearing].)

*Jeneski* is inapposite.  The rejection of a TAR is an action by Medi-Cal that directly and categorically precludes Medi-Cal coverage for a particular individual for a particular service or benefit, based on Medi-Cal's assessment of its medical necessity or propriety.  If the beneficiary has no other coverage besides Medi-Cal (and cannot pay for the service), the beneficiary will not receive the service.  OHC coding, by contrast, merely assigns a status that might, in the future, lead a private provider to delay the beneficiary's receipt of the service.  If the beneficiary in fact has available OHC, he or she will receive the service from the OHC; if the beneficiary does not actually have available OHC, the problem can be remedied by an informal process DHCS has already established, so that the beneficiary will still receive the service.  *Jeneski* does not compel the conclusion that an OHC coding event triggers a hearing under section 10950.

Petitioners fail to establish that DHCS has a ministerial duty under section 10950 or regulation 50951 to provide a hearing for OHC coding events.[30]

B.  The California Constitution Does Not Require a Hearing

Petitioners next contend that respondents have a duty, under the due process clauses of the California Constitution, to provide notice and hearing rights when DHCS changes a Medi-Cal beneficiary's status to OHC.  (See Cal. Const., art. I, §§ 7(a), 15.)

"[A]pplication of the [due process] clauses [of the California Constitution] must be determined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures."  (*People v. Ramirez* (1979) 25 Cal.3d 260, 263–264 (*Ramirez*).)  Thus, when a person is "deprived of a statutorily conferred benefit,"

---

[30]     To the extent petitioners contend they are entitled to contemporaneous notice of DHCS coding under state statutory or regulatory law, their contention is amiss.  Section 10950 and regulation 50951 refer to a hearing, not notice.  Regulation 50179(a) requires county departments to notify beneficiaries of their "Medi-Cal-only *eligibility* or ineligibility, and of any changes made in their eligibility status or share of cost."  We revisit the notice issue in the context of California due process guarantees, *post*.

74

there must be an "assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." (*Id*. at p. 264.) "The required procedural safeguards are those that will, without unduly burdening the government, maximize the accuracy of the resulting decision and respect the dignity of the individual subjected to the decisionmaking process." (*Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 390 (*Oberholzer*).)

### 1. Statutorily Conferred Benefit or Interest

Respondents argue that petitioners have not satisfied the threshold requirement—that they have been deprived of a "statutorily conferred benefit" or interest. (*Ramirez*, *supra*, 25 Cal.3d at p. 264; *Ryan v. California Interscholastic Federation–San Diego Section* (2001) 94 Cal.App.4th 1048, 1071.) According to respondents, OHC coding and DHCS guidelines allowing providers to refer beneficiaries to their OHC for services do not themselves deprive the beneficiary of Medi-Cal services; furthermore, a provider's refusal of service or referral to other providers does not constitute state action to which state due process protections may apply. (Citing *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 281–282.) Petitioners counter that Medi-Cal is a statutory benefit, and erroneously coding a recipient as having OHC terminates or suspends enjoyment of that benefit.

We question whether changing a Medi-Cal beneficiary's status to "OHC" and entering or maintaining other OHC-related codes constitutes an "adjudicative procedure[]" (*Ramirez*, *supra*, 25 Cal.3d at pp. 263–264) targeted by our state's due process clause. We also question petitioners' assertion that coding a beneficiary as having OHC in itself terminates or suspends statutory entitlement to Medi-Cal services. Nonetheless, OHC codes do affect the likelihood that some beneficiaries will promptly obtain services otherwise mandated by the Medi-Cal statutes. We will therefore assume the threshold requirement is met and proceed with a due process analysis.

75

## 2. The *Ramirez* Test

In determining what process is due, consideration must be given to "(1) the *private interest* that will be affected by the official action, (2) the *risk of an erroneous deprivation* of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the *dignitary interest* in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official, and (4) the *governmental interest*, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Ramirez*, *supra*, 25 Cal.3d at p. 269, italics added.)

### a. Beneficiary's Private Interest Affected by Coding

As discussed *ante*, a coding event, in itself, has no immediate effect on the beneficiary until the beneficiary seeks a nonemergency service covered by Medi-Cal from a Medi-Cal provider, the OHC codes turn out to be erroneous or misleading, and the Medi-Cal provider opts not to provide the service and instead refers the beneficiary to another provider, thus risking a delay in the beneficiary's receipt of medical services. Petitioners maintain that such a delay in treatment, however, can exacerbate medical conditions. They insist that some recipients are denied urgently needed treatment for weeks or months as they navigate DHCS or county procedures to obtain removal or correction of OHC codes. They produce evidence that delays in service can result in severe pain, a lack of affordable medication, sleeplessness, the need to pay out of pocket for medications, and deteriorating health. And while DHCS counters that these delays are not significant in light of procedures designed to correct errors within days (or immediately if DHCS is advised that the OHC codes are posing a barrier to care), there is at least a *potential* effect on the beneficiary's interest in receiving prompt medical services under Medi-Cal.

76

### b. Risk of Violation; Value of Additional Safeguards

We next consider the risk that this private interest will be violated, and the probable value of the additional procedural safeguards that petitioners propose.

Petitioners contend there is a high risk that OHC coding will violate the private interests of beneficiaries because of a "rampant" problem with incorrect Social Security numbers entered into computer records, faulty information from noncustodial parents concerning medical support orders, and partial services covered by insurance companies incorrectly labeled as "comprehensive." Petitioners also note that, at one point in time, DHCS was receiving approximately 100 to 150 requests per day to correct OHC problems.

However, petitioners have included nothing in the record to actually quantify this risk. They do not provide evidence indicating the percentage of coding events that are erroneous, the number or percentage of Medi-Cal beneficiaries who are affected, or the number or percentage who experience a delay due to incorrect OHC codes. (Indeed, petitioners themselves do not allege that they suffered any coding error at all.) Even the statistic of 100 to 150 daily requests to fix OHC coding problems would equate to fewer than 40,000 requests a year out of 7 or 8 million beneficiaries, of whom 500,000 to 700,000 have OHC. In short, petitioners fail to show a high risk that the private interests of a Medi-Cal beneficiary will be adversely affected by any particular coding event.

As to the second aspect of this element—the probable value of the proposed additional procedural safeguards—petitioners do not point to any evidence in the record, or even substantially argue, that the additional safeguard or procedure of a *hearing* for every OHC coding event (or even for erroneous codes) would have any significant value above the procedures DHCS already has.

Instead, petitioners turn their attention to DHCS providing contemporaneous *notice* of a coding event, so a beneficiary can take steps to obtain correction of the error before the beneficiary "makes a doctor's appointment, is turned away at the office, and then must wait weeks or months for care."

It is true that immediate notice of OHC coding might enable beneficiaries who know they do not actually have OHC to obtain correction of the error before seeking medical services. The question, however, is whether petitioners have shown that this potential benefit is so significantly advantageous over existing procedures as to compel DHCS—who could not know which codes are incorrect at the time of coding—to notify *all* beneficiaries of each and every coding event, even though a coding error may exist only as to some subset of codes and beneficiaries. After all, there are millions of Medi-Cal beneficiaries in the system, and hundreds of thousands who are coded with OHC.

Based on the appellate record, we agree with respondents that the probable value of providing contemporaneous notice of coding events is relatively low. As things stand now, beneficiaries will discover any OHC coding error if they are turned down for service by a provider (as occurred with petitioners Marquez and Rivera). At that point, the beneficiary may assess whether the OHC information is incorrect and request correction or suppression through the county or DHCS. The most recent evidence in the record is that such requests are normally handled within 24 hours.[31]

Petitioners nevertheless complain that merely giving beneficiaries the ability to contact the county or DHCS does not suffice for due process notice, and DHCS is improperly shifting the burden of notice to beneficiaries. (Citing *Vargas v. Trainor* (7th Cir. 1974) 508 F.2d 485, 489–490 (*Vargas*); *Ortiz v. Eichler* (D.Del. 1985) 616 F.Supp. 1046, 1062, on reargument (D.Del. 1985) 616 F.Supp. 1066, affd. (3d Cir. 1986) 794 F.2d 889 (*Ortiz*). In *Vargas* and *Ortiz*, however, it was undisputed that the recipients were *entitled* to a hearing on the agency's decision to reduce or terminate their benefits.

_____

[31] Petitioners state in their reply brief: "And indeed, those Petitioners and declarants who were able to restore their Medi-Cal were only able to do so after they contacted legal aid offices and other advocacy groups. [Record citations.] Poor people should not have to retain lawyers to see their doctors." The record citations do not support this assertion. Petitioners did not experience erroneous OHC coding. There is no evidence petitioners attempted to contact the county or DHCS to resolve their problems, and when DHCS was finally advised, petitioners' and declarants' matters were promptly resolved.

The question before those courts, therefore, was not whether a beneficiary was entitled to notice of an occurrence (such as a coding event), but whether the beneficiary was given adequate notice of the agency's decision so it could be challenged meaningfully at the upcoming hearing.  (*Vargas*, *supra*, 508 F.2d at pp. 487–490; *Ortiz*, *supra*, 616 F.Supp. at pp. 1051–1053, 1061–1062.)  Here, unlike the recipients in *Vargas* and *Ortiz*, the beneficiaries do not have undisputed entitlement to a hearing for a coding event—indeed, their entitlement to a hearing is an issue before us.  Petitioners' reliance on *Vargas* and *Ortiz* thus puts the cart before the horse.  Moreover, beneficiaries *do* have adequate notice, for purposes of challenging an incorrect OHC code, when they are told by providers that they are being referred due to their apparent OHC:  with this information, they can turn to the county or DHCS for relief, and there is nothing more that DHCS could tell them.

### c.  Beneficiary's Dignitary Interest

We next turn to the dignitary interest beneficiaries have in being informed of the nature, grounds, and consequences of the DHCS action and in being able to present their side of the story before a responsible government official.  The point here is that, even if participation in the decision-making process would not alter the outcome, the fact of participation recognizes the dignity of the individual affected.  (See *Ramirez*, *supra*, 25 Cal.3d at p. 268.)

Beneficiaries who believe there has been an error in OHC coding may be "heard" informally through existing procedures, in which beneficiaries provide information necessary to change or remove their OHC coding to their provider, county workers, or DHCS.  They are informed of the nature, grounds, and consequences of the DHCS action and are able to present their side of the story before a government official.

Petitioners nonetheless argue that respondents' existing procedures do not treat beneficiaries with respect and dignity.  They offer a situation when a mother arrives with her child for a doctor's appointment only to be unexpectedly turned away and told she cannot get treatment for her child unless she makes a payment she cannot afford; or a

woman in pain and suspecting infection after having a Caesarean section resorts to pulling out her surgical staples when unable to access medical care. But petitioners are talking about what might happen as a *result* of an incorrect code, if it is not corrected. The question here is whether a hearing or notice of a coding event is necessary for the beneficiary to have dignity by way of input and participation in the process for deciding whether the coding is correct. Petitioners cite no evidence in the record on this point.

Lastly, petitioners' reliance on *Barron v. Superior Court* (2009) 173 Cal.App.4th 293 (*Barron*) is unhelpful. There, a trial court ruling was reversed, in part because it was based on a matter the court raised without warning at the hearing, and thus the proceeding did not adequately comport with due process. (*Id*. at pp. 297–300.) *Barron* says nothing about the adequacy of the DHCS procedures with respect to OHC coding.

### d. Government Interests

The final part of the due process analysis is consideration of the "governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Ramirez*, *supra*, 25 Cal.3d at p. 269.) The government's interests in conserving scarce fiscal and administrative resources and in not imposing further burdens on providers are substantial. Although this governmental interest does not in itself outweigh the recipient's interest in obtaining services, it is a legitimate state concern. (*Frank v. Kizer* (1989) 213 Cal.App.3d 919, 924–925.)

Here, it is undisputed, based on the evidence in the record, that hundreds of thousands of Medi-Cal beneficiaries have OHC at any given time. Moreover, coverage information is updated by DHCS monthly, and evidence in the record suggests that OHC information changes frequently. It may fairly be inferred from the record that formal

notice and hearing procedures would necessarily impose fiscal and administrative burdens on the state.[32]

### e. Balancing the Interests

An OHC coding event has a potential effect on a beneficiary's interest in receiving nonemergency medical services under Medi-Cal without undue delay. However, petitioners have not shown a high risk that any particular OHC code is erroneous or would cause intolerable delay. Nor have they demonstrated that a hearing—or notice of a coding event (or referral to an OHC provider)—would have significant value over DHCS's existing procedures, given the record of prompt resolution of coding errors. Furthermore, the dignitary interest of beneficiaries is facilitated by existing procedures, which allow beneficiaries to participate in the governmental process by which DHCS codes are changed, removed, and maintained. In light of the size of the task DHCS would face in providing notice and a hearing for every OHC-related coding event as to hundreds of thousands of Medi-Cal beneficiaries who have OHC at any given time, with monthly updates on OHC information, the marginal benefit of petitioners' proposed notice and hearing is outweighed by the substantial cost and burden on DHCS. (See *Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1183; *Oberholzer*, *supra*, 20 Cal.4th at pp. 390–391.) California due process does not compel notice and a hearing for OHC coding events.[33]

---

[32] Petitioners urge that, since DHCS did not present evidence on the projected cost of providing notice, we should view with skepticism DHCS's claim that the cost of providing notice would be substantial. In the same paragraph, petitioners contend that "DHCS has a multi-billion dollar budget" and it "can afford to provide advance notice to recipients whose Medi-Cal benefits are threatened by possibly erroneous recoding to OHC"—without any citation to evidence in the record.

[33] This is not to say that we believe giving a beneficiary notice of his or her OHC status is a bad idea. To the contrary, it may well be that DHCS or our Legislature can devise an appropriate method of informing beneficiaries of their OHC status, whether by mail, email, secure access to an online profile, or some other procedure. We hold only that, based on the record in this appeal, petitioners have not established that the notice and hearing they seek are compelled under California law.

Accordingly, petitioners fail to establish that respondents have violated a ministerial duty in this regard.

## C. Ministerial Duties Under State and Federal Law

Petitioners lastly contend that, by the manner in which DHCS handles OHC coding and instructs Medi-Cal providers, respondents are violating a number of other duties under state and federal law. We conclude they have not shown any violation of a ministerial duty.[34]

### 1. Duty to Provide Medically Necessary Services

According to petitioners, DHCS violates a ministerial duty to provide medically necessary services to Medi-Cal beneficiaries who are coded as having OHC when those services are not actually available from OHC.

#### a. Welfare and Institutions Code Section 14005

Welfare and Institutions Code section 14005, subdivision (a) requires that Medi-Cal's "health care benefits and services" "shall be provided" to eligible state residents to the extent those services and benefits are not "provided nor available under other contractual or legal entitlements of the person."

---

[34] Respondents contend that CMS has approved California's State Plan implementing federal Medicaid requirements, including provisions relating to third party liability, DHCS data match and OHC coding processes, and copayments, and CMS approval is "entitled to deference unless 'palpably erroneous.' " (Citing *RCJ Medical Services, Inc. v. Bontá* (2001) 91 Cal.App.4th 986, 1011; *Managed Pharmacy Care v. Sebelius* (9th Cir. 2013) 716 F.3d 1235, 1247–1248; see *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 810 (*Olszewski*) [" 'Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans' "].) Petitioners disagree, because their claims are based on state law as well as federal law, and, in any event, CMS has not approved the *specific* policies challenged here. (See *Olszewski, supra,* 30 Cal.4th at pp. 825–826.) Furthermore, they claim, *DHCS's* interpretation of state law is not conclusive, and its interpretation of federal law, such as 42 U.S.C. §§ 1396a(a)(8) and (25), is not entitled to deference at all. (*Orthopaedic Hosp. v. Belshe* (9th Cir. 1997) 103 F.3d 1491, 1495.) We need not resolve this debate: even without deference to DHCS procedures approved by CMS, we conclude petitioners fail to demonstrate a violation of a ministerial duty.

Petitioners argue that respondents violate section 14005 because, despite knowledge of OHC coding errors, DHCS instructs Medi-Cal providers that they may refuse to treat beneficiaries who have OHC codes when the providers do not belong to the OHC network, and consequently beneficiaries whose OHC codes are erroneous—and do not *actually* have available OHC—are deprived of Medi-Cal services and benefits.

Petitioners fail to establish any basis for a writ of mandate. In the first place, as explained *ante*, DHCS's referral authorization does not mean that the beneficiary is denied a covered service; it merely means that the beneficiary will receive the service from a Medi-Cal provider who is a member of the beneficiary's OHC network. Indeed, DHCS's instruction that providers may refer beneficiaries to outside OHC networks is consistent with section 14005 itself—which clearly indicates that Medi-Cal services should not be provided if OHC is available—as well as other statutes to the same effect. (Welf. & Inst. Code, §§ 10020, subd. (a), 14000, subd. (b).)

Furthermore, even if an OHC code is incorrect and OHC is *not* available, DHCS does not preclude any medically necessary service; DHCS will suppress the code or correct it so the services may be rendered under Medi-Cal.

Petitioners' arguments, therefore, do not show that DHCS fails to comply with section 14005, but merely debate *how* DHCS should comply. Petitioners suggest, for example, that DHCS should affirmatively instruct providers *not* to refer Medi-Cal beneficiaries with OHC codes to OHC for treatment unless providers first confirm that the requested services are indeed covered by OHC. There is, however, no law requiring DHCS to do so. Petitioners further complain that MEDS should provide more detailed information regarding the services covered by the beneficiary's OHC, as well as coverage limitations and copayment or geographic information. Again, however, petitioners do not point to any legal requirement that DHCS do this. And, as a practical matter, the information that DHCS already makes available should enable the provider to contact the OHC and obtain current and accurate information relevant to the beneficiary's *specific* requested service, which is a far more efficient procedure than forcing DHCS to

83

gather the information and update it on an ongoing basis with respect to all potential coverage provisions and eventualities.

While a writ of mandate may issue to compel compliance with a ministerial duty—an act the law specifically requires—it may not issue to compel an agency to perform that legal duty in a particular manner, or control its exercise of discretion by forcing it to meet its legal obligations in a specific way. (Code Civ. Proc., § 1085; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267; *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.* (2012) 208 Cal.App.4th 1438, 1462–1463.) Petitioners do not establish entitlement to a writ of mandate.

### b. 42 United States Code Section 1396a(a)

Federal law requires a state plan to make assistance available to all eligible beneficiaries. (42 U.S.C. § 1396a(a)(10)(A)(i).) In addition, the state plan must specify that a Medi-Cal provider "may not refuse to furnish services to an individual (who is entitled to have payment made under the plan for the services the person furnishes) because of a third party's potential liability for payment for the service." (42 U.S.C. § 1396a(a)(25)(D); see 42 C.F.R. § 447.20(b) (2014) ["a third party's potential liability for the service(s)" is not a reason for a provider to refuse to furnish Medicaid services to an eligible beneficiary].)

Petitioners contend DHCS violates these provisions because it tells providers they *can* refuse to furnish services to a beneficiary because of a third party's (OHC's) potential liability for the service. Petitioners are incorrect.

First, DHCS meets the duty imposed by these federal provisions by instructing Medi-Cal providers—in the DHCS manual for providers (Provider Manual)—that they "cannot deny services because . . . [t]he recipient has other health insurance coverage in addition to Medi-Cal," and by reminding providers that they "must not refuse to furnish Medi-Cal covered services to eligible recipients because of a third party's potential liability."

84

Second, DHCS's advisement that providers may refer beneficiaries to their OHC is not contrary to these provisions. The referral is not because the third party (OHC) is potentially liable for *payment*, but because the OHC must furnish the services so that OHC can be exhausted before Medi-Cal benefits are used. If a third party (even an OHC carrier) were only responsible for *payment* for the service, the provider would be bound by the nonrefusal requirement.

Looking at it another way, the nonrefusal requirement relates only to services for which the beneficiary "is entitled to have payment made" by Medi-Cal. (42 U.S.C. § 1396a(a)(25)(D).) If a beneficiary has available OHC, the beneficiary is not entitled to have payment made by Medi-Cal, and the nonrefusal requirement would not apply. In any event, petitioners fail to show that respondents are violating federal law.[35]

### 2. Duty to Provide Services Promptly and Humanely

Under federal law, the state plan must provide that medical assistance from a Medicaid program "shall be furnished with reasonable promptness to all eligible individuals." (42 U.S.C. § 1396a(a)(8); see 42 C.F.R. § 435.930(a) (2014) [the Medicaid agency "must . . . [f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures"].)

Similarly, under California law, "aid shall be administered and services provided promptly and humanely." (Welf. & Inst. Code, § 10000.) This statute, however, sets forth only a "general statement of policy." (*Board of Supervisors v. Superior Court* (*Comer*) (1989) 207 Cal.App.3d 552, 564 (*Comer*); *Watkins v. County of Alameda* (2009) 177 Cal.App.4th 320, 344 (*Watkins*).) It does not set forth any specific duty or course of conduct an agency must take, but leaves to the agency's discretion how to pursue the policy goal.

---

[35] In a footnote in their opening brief, petitioners argue that DHCS is violating the comparability requirement of 42 U.S.C. § 1396a(a)(10)(B) by providing covered services to Medi-Cal beneficiaries who do not have available OHC, but not to beneficiaries who are coded to have available OHC but actually do not. Failing to provide substantial argument on this issue, petitioners have abandoned it.

Petitioners argue that respondents violate these provisions by subjecting Medi-Cal beneficiaries to unreasonable delays: because DHCS gives no notice to beneficiaries when they are classified as having OHC, beneficiaries may schedule appointments and seek care from Medi-Cal providers who will decline to treat them; beneficiaries then have to wait for an appointment within the OHC's network, and may learn that they do not have available OHC after all or that the OHC does not provide the service; and efforts to remove or correct erroneous OHC codes can take weeks or longer.

Based on the record in this appeal that OHC errors do not affect the provision of emergency services, that correcting OHC errors may be accomplished within days or weeks for nonemergency services, and that DHCS has taken steps to correct or suppress any erroneous OHC codes, petitioners have not established a failure on the part of DHCS to furnish medical assistance humanely and with reasonable promptness. The system is not perfect, and there may be individuals who, unfortunately, suffer delays and increased pain or complications. We do not minimize those difficulties. But DHCS cannot simply adopt policies and procedures mandating that, for example, fee-for-service providers *do* treat a Medi-Cal beneficiary even if his or her Medi-Cal record indicates the service is available through an outside OHC network, in light of the more specific and controlling statutory obligation to ensure that Medi-Cal is a payor of last resort. (Welf. & Inst. Code, §§ 10020, subd. (a), 14005, subd. (b), 14023, subd. (c); see *Watkins*, *supra*, 177 Cal.App.4th at p. 344 [Legislature's allowance of restrictions on eligibility for General Assistance "necessarily supersedes the more general principles contained in [Welf. & Inst. Code, §] 10000"]; *Comer*, *supra*, 207 Cal.App.3d at p. 564 [statute setting limits on mental health services controlled over more general policy statement in Welf. & Inst. Code, § 10000].) And even if there were other feasible procedures by which services might be delivered *more* promptly or *more* humanely, DHCS's methods accomplish the minimum requirements of the statutes' objectives, and the possibility of alternative procedures is not at issue for purposes of mandamus.

Petitioners' reliance on *Cooke v. Superior Court* (1989) 213 Cal.App.3d 401, disapproved on other grounds in *County of San Diego*, *supra*, 15 Cal.4th at p. 106, is

86

misplaced. There, a county medical services program violated "section 10000's command that relief be administered humanely" when it only offered emergency dental care, and its refusal to offer nonemergency care forced indigent residents to "live with untreated infection and chronic pain." (*Id.* at pp. 404–405, 413–415.) Here, DHCS procedures do provide for nonemergency care.

### 3. Duty Not to Allow Copayment Above Medicaid Limit

Federal law limits the amount and type of cost sharing—including copayments—a state can require Medicaid beneficiaries to contribute to covered health care. Some beneficiaries can generally be charged a "nominal" amount, while certain beneficiaries under the age of 18 and pregnant women cannot be charged any copayment. (42 U.S.C. §§ 1396o(a) & (b), 1396o-1(b)(3)(B); 42 C.F.R. §§ 447.51–447.57 (2014).)

In the context of OHC, federal guidance has further specified that "if the applicant/recipient is required to pay a deductible or copayment for utilization of a service under a [private prepaid health] plan, that plan service *is not an available third party resource* unless the State agency or any other third party (i.e., other than the recipient) pays the deductible or copayment on behalf of the individual, or the deductible or copayment is waived by the plan." (HCFA Program Issuance Transmittal Notice, Region IV, MCD-32-86, Third Party Liability—Medicaid Eligible Enrollment in a Non-Medicaid Prepaid Capitation Arangement, Aug. 6, 1986, italics added.) Thus a plan would not constitute available OHC if the beneficiary must pay the copayment; and if OHC is not available, DHCS cannot deny payment of services under Medi-Cal.

Petitioners complain that DHCS has no policy deeming OHC unavailable when the OHC assesses copayments or other charges in excess of the amounts permitted by Medi-Cal. Moreover, while DHCS has a policy of *paying* copayments on behalf of beneficiaries with OHC if the beneficiary's Medi-Cal provider is a member of the OHC's network (and can therefore bill the OHC for delivering care), DHCS does not cover the payment if the provider does not belong to the OHC network, so the beneficiary's OHC will still be considered available even when copayments required by the OHC exceed

Medicaid limits.  Petitioners seek a writ of mandate prohibiting DHCS from instructing Medi-Cal providers to decline treatment and refer beneficiaries to their OHC when the OHC charges copayments for covered services above those allowed by federal and state law.  Otherwise, they claim, beneficiaries with little or no income are forced to choose between paying a copayment above what is allowed by Medicaid or forgoing needed medical care.  (Citing *Nebraska Pharmacists v. Dept. of Social Services* (D.Neb. 1994) 863 F.Supp. 1037, 1046 ["the difference between a one dollar or two dollar copayment . . . is significant (and not nominal) to those who are poor and in need of prescription services"].)

Petitioners are incorrect.  DHCS instructs Medi-Cal providers that they may *not* charge beneficiaries with copayments above what is established by Medi-Cal.  The Provider Manual identifies these amounts, consistent with law, as one dollar for outpatient services and drug prescriptions and refills, and five dollars for nonemergency services provided in an emergency room.  Providers are also advised that "the collection of the copayment by the provider [from the beneficiary] is optional" (although the beneficiary remains liable to the provider for it), and "[a] provider of service cannot, under law, deny care or services to an individual solely because of the person's inability to copay."  (See Welf. & Inst. Code, § 14134, subd. (a)(8).)

As a result, if a beneficiary has OHC and the Medi-Cal provider is not within the OHC network, and is referred to a provider who is within the network and enrolled with Medi-Cal (and the beneficiary presents his or her BIC, or discloses he or she has Medi-Cal), the beneficiary will *not* be charged more than the nominal copayment amount authorized under Medi-Cal.[36]  In short, the beneficiary need only go to a Medi-Cal provider within the OHC network and the beneficiary will not have a copayment over Medi-Cal limits.

There is, therefore, no need for petitioners' proposed requirement that DHCS have a policy requiring that OHC be deemed unavailable if the OHC carrier may assess a

---

[36]     Petitioner Marquez did not present J.O.'s BIC to Kaiser or otherwise advise Kaiser that he had Medi-Cal coverage.

copayment in excess of the amount permitted under Medi-Cal. Moreover, DHCS is in compliance with the law.

### 4. Duty to "Pay and Chase"

As discussed *ante*, in most instances a Medi-Cal provider must seek payment first from a beneficiary's OHC. For prenatal or preventive care services, however, the state must pay providers (without the provider first billing the OHC) and then "chase" the OHC for reimbursement. (42 U.S.C. § 1396a(a)(25)(E).) Similarly, for services provided to minors who have OHC pursuant to a child support enforcement order, the state must pay providers if the OHC has not made payment within 30 days after the service, and then chase the OHC. Petitioners contend respondents violate their ministerial duties by failing to apply these requirements.

#### a. Standing

These "pay-and-chase" provisions address only the process by which providers are reimbursed for certain types of services rendered. They are certainly of interest to *providers*, but respondents argue they do not give rise to any "public right" or "public duty" sufficient to support "citizen" standing under the judicially created exception to the beneficial interest requirement. (*Green*, *supra*, 29 Cal.3d at p. 144.) Nor, respondents claim, can petitioners show a beneficial interest requisite for mandamus. (See Code Civ. Proc., § 1086; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165, 170.) Indeed, courts have held that certain provisions of 42 United States Code section 1396a(a)(25) grant neither beneficiaries nor providers rights enforceable under federal law. *(Martes v. Chief Exec. Officer of South Broward* (11th Cir. 2012) 683 F.3d 1323, 1330 ["balance billing" provisions]; *Wesley Health Care Center, Inc. v. DeBuono* (2d Cir. 2001) 244 F.3d 280, 283–285 [cost-avoidance procedures].)

Petitioners, on the other hand, insist that pay-and-chase requirements protect beneficiaries by ensuring services to those needing prenatal care and preventive pediatric care or having OHC through a child support enforcement order. The provision of public

aid to the needy is of statewide concern and generally a proper subject for mandamus. (See, e.g., *Bd. of Soc. Welfare v. County of L.A.* (1945) 27 Cal.2d 98, 100; *Green*, *supra*, 29 Cal.3d at pp. 144–145; *Conlan*, *supra*, 102 Cal.App.4th at pp. 763–764; *Brown v. Crandall* (2011) 198 Cal.App.4th 1, 13–14.) We will assume petitioners have standing.

### b. Prenatal or Preventive Pediatric Care

As mentioned, federal law requires the state plan to provide that, "in the case of prenatal or preventive pediatric care" covered by the plan, the state shall make payment "without regard to the liability of a third party for payment for such services" and then "seek reimbursement from such third party." (42 U.S.C. § 1396a(a)(25)(E); see 42 C.F.R. § 433.139(b)(3)(i) (2014) ["The agency must pay the full amount allowed under the agency's payment schedule for the claim and seek reimbursement from any liable third party" if the "claim is prenatal care for pregnant women, or preventive pediatric services"].) A provider may thus bill the state directly for these services without having to seek recovery first from the beneficiary's OHC (or other potentially liable third party).

DHCS's Provider Manual states that Medi-Cal may *not* be billed directly for pregnancy care and preventive pediatric services if the beneficiary has OHC through an HMO, and that the "HMO benefits must be used first." But this is consistent with the obligation that OHC benefits be used before Medi-Cal. Moreover, the record also indicates that DHCS has "established business rules with its fiscal intermediary, Xerox Corporation, directing it to suppress any [OHC] and *allow* payment of Medi-Cal fee-for-service provider claims for any prenatal and pediatric preventive service procedure claims services." (Italics added.)

Nonetheless, petitioners argue, the DHCS rules with Xerox do not expressly apply where a Medi-Cal provider is *not* a fee-for-service provider and delivers the prenatal or preventive pediatric care on a managed care basis to a Medi-Cal beneficiary who has OHC through an HMO. Furthermore, petitioners contend, there is no indication that DHCS *tells* providers to submit reimbursement claims to Xerox rather than the OHC.

As a result, petitioners speculate that providers will bill the OHC HMO, rather than DHCS or Xerox.

The critical point, however, is that petitioners do not direct us to any record evidence that respondents are actually failing to comply with the law.  Petitioners do not cite any instance in which DHCS failed to make payment for prenatal care or preventive pediatric care in violation of a statutory mandate.  In the absence of a violation of a legal duty, petitioners fail to demonstrate any basis for mandamus.[37]

### c.  Minors with OHC Pursuant to Court Order

A state plan must provide that the state shall pay a provider, and later seek reimbursement from a beneficiary's OHC, for services provided to a beneficiary "on whose behalf child support enforcement is being carried out by the State," if "payment has not been made by such third party within 30 days after such services are furnished." (42 U.S.C. § 1396a(a)(25)(F).)  Petitioners contend that respondents have already admitted their failure to comply with this requirement.

### (1)  DHCS's Discovery Response

In a request for admission, petitioners asked respondents to admit:  "For children who have both Medi-Cal coverage and OHC and whose non-custodial parents have been ordered by a court to provide 'medical support' (i.e. health insurance), Respondent DHCS' policies and procedures do not *ensure* that the Medi-Cal program pays health care providers for providing service(s) to these children when the OHC has not [been] paid for these service(s) within 30 days of provision of the service(s)."  (Italics added.)  After objecting to the request as vague and ambiguous, especially as to the phrase "do not

---

[37]     Respondents add that, for services to be subject to pay-and-chase rules, the services must be "*covered* under the State [Medi-Cal] plan." (42 U.S.C. § 1396a(a)(25)(E), italics added.)  Services that a beneficiary is entitled to receive through his or her OHC must be exhausted before accessing Medi-Cal benefits and, in respondents' view, are not covered by the plan.  (Welf. & Inst. Code, §§ 10020, subd. (a), 14000, subd. (b).)  DHCS therefore asserts that it properly allows providers to refer beneficiaries to their OHC network with a managed care plan where OHC information indicates the services are available through that plan.

91

ensure," respondents admitted the request "because if DHCS did otherwise, it would be not complying with federal guidelines."

Petitioners contend this is an admission of noncompliance with 42 United States Code section 1396a(a)(25)(F), and that respondents are bound by the admission. (Code Civ. Proc. § 2033.410, subd. (a); *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 775.) Respondents counter that they objected to the request for admission, did not intend to admit noncompliance with the law, and the State Plan and DHCS's Medi-Cal Eligibility Manual conclusively demonstrate that DHCS not only complies but goes beyond the requirements of the section, allowing providers to bill Medi-Cal for services provided to children who have court-ordered OHC without first billing the OHC carrier and waiting for a failure by the carrier to respond.

DHCS's discovery response was not an unqualified admission, and there is some ambiguity as to what it meant in agreeing that its policies and procedures do not "ensure" that Medi-Cal pays providers when the OHC has failed to pay within 30 days. In any event, the trial court did not err, in the context of this mandamus action, in considering the State Plan and the Medi-Cal Eligibility Manual to determine what, in fact, respondents' relevant procedures are. (See *Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 277–278.)

*(2) Merits*

The State Plan provides that the "pay and chase method" will be used "for the purpose of recovering Third Party Liability when services covered under the plan are furnished to an individual on whose behalf child support enforcement is being carried out by" the relevant state agency. In addition, the Medi-Cal Eligibility Manual indicates that "pay and chase" applies to services to a Medi-Cal beneficiary with OHC resulting from a child support or medical support order. Specifically, it states, "Under Federal Law (42 [United States Code section] 1396a[(a)](25)) health insurance belonging to a Medi-Cal beneficiary in a child or medical support enforcement case is used by the following method, also referred to as 'pay and chase.' "

These policy statements reflect respondents' compliance with the law.  Indeed, DHCS policy seems to *exceed* the requirements of 42 United States Code section 1396a(a)(25)(F) and require pay-and-chase billing for covered services provided to children under medical support orders *without regard* to whether the OHC has first failed to pay within 30 days.

Petitioners nevertheless argue that respondents have cited no provision in the Provider Manual, or identified any instruction to DHCS's fiscal intermediary, that shows the state has a procedure for *ensuring* such payment to providers.  But petitioners cite no law expressly requiring such a procedure.  Nor do they cite any evidence that the absence of this instruction has caused a violation of the pay-and-chase rule.

Petitioners also note that the Eligibility Manual, in addition to stating that pay-and-chase rules apply, further states, "When the other health insurance is a Prepaid Health Plan (PHP) or a Health Maintenance Organization (HMO), however, the dependent [child] *must* utilize the plan's facilities for regular medical care."  (Italics substituted for underscoring.)  Thus, petitioners infer, the DHCS policy is that "pay and chase" does *not* apply to children with medical support orders if their OHC is with managed care.

Petitioners are incorrect.  The cited language merely reiterates the fact that a beneficiary, including one under a child support order, who has OHC for the services at issue, is required to utilize the OHC for those services.  Accordingly, petitioners do not establish that DHCS is in violation of any ministerial duty with respect to pay and chase.

In the final analysis, petitioners fail to demonstrate entitlement to their requested writ of mandate.[38]

---

[38]   Respondents filed a request on October 9, 2014, seeking judicial notice of a letter from DHCS to counties that updated DHCS instructions regarding the reporting and correction of OHC information, along with an updated version of DHCS OHC reporting and correction procedures from the DHCS Web site, which advises beneficiaries that they may update OHC information and provides a means of doing so.  Petitioners opposed the request on the grounds that the material was not presented to the trial court and the truth of the matters asserted in official acts of state agencies is not subject to judicial notice.

## III.  DISPOSITION

The judgment is affirmed.

———————————————————

NEEDHAM, J.

We concur.

———————————————————

SIMONS, Acting P.J.

———————————————————

BRUINIERS, J.

———————————————————

We deferred ruling until our decision on the merits.  We now grant the request, but only for purposes of general background.  We do not rely on the material in reaching our conclusions in this appeal; we rely only on the evidence before the trial court.

San Francisco County Superior Court Case No. CPF09509847, Richard A. Kramer, Judge.

Western Center on Law and Poverty, Robert D. Newman and Richard A. Rothschild; Bay Area Legal Aid, Michael Keys; Youth Law Center, Alice Bussiere and Maria Ramiu; Multiforum Advocacy Solutions, Lucy Quacinella for Plaintiffs and Appellants.

Neighborhood Legal Services of Los Angeles County, Catherine S. Murphy for Plaintiff and Appellant Maricella Rivera.

Abigail K. Coursolle, Kimberly Lewis and Shyaam Subramanian for National Health Law Program as Amicus Curiae on behalf of Appellants.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Susan M. Carson, Joshua N. Sondheimer and Cheryl L. Feiner, Deputy Attorneys General, for Defendants and Respondents.